GEORGE W. GRIFFITHS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOHN GRIFFITHS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 42498, 43074. Promulgated April 26, 1932.

*Paysoff Tinkoff*, *Esq.*, *David Munson*, *Esq.*, and *Fay W. Johnson*, *Esq.*, for the petitioners.

*J. E. Marshall*, *Esq.*, *C. R. Marshall*, *Esq.*, *Arthur Carnduff*, *Esq.*, and *W. S. Delaney*, *Esq.*, for the respondent.

1298

1300

OPINION.

SEAWELL: Collateral issues have been so magnified in the voluminous record presented for consideration in these proceedings that we deem it pertinent to state the two major issues involved, namely: (1) What capital net gain, if any, was realized by the petitioners in 1923 when in a reorganization they exchanged their stock in the Illinois corporation for stock of the Delaware corporation and cash? and (2) What capital net gain, if any, was realized by the petitioners in 1925 when the Delaware corporation redeemed its preferred stock? Both issues are closely related in that the parties are agreed that the starting point for the determination of gain in each instance is the March 1, 1913, value of the stock of the Illinois corporation. A great part of the petitioners' proof and argument deals with the proposition whether certain profits on the Boston Store contract were profits of the partnership or profits of the Illinois corporation; in fact, so much is this point emphasized that it would seem that petitioners are convinced that an answer to this question is decisive as to both of the principal issues involved. We disagree. We are not seeking to determine a tax on such profits, nor are we concerned with a tax on either the partnership or the Illinois corporation. It is of course true that earnings of a corporation prior to a given date are often used as a basis of values on that date, but we know of no rule of law from which it would follow that because the average earnings of a corporation prior to a given date were in a certain amount a valuation of its stock could necessarily be predicated thereon. The main purpose of the petitioners in urging that the profits from the Boston Store contract be considered as earnings of the Illinois corporation prior to March 1, 1913, is to arrive at the value of its intangible assets on that date under the method employed by the Commissioner in his ruling referred to as A. R. M. 34, but, as we said in *James Couzens*, 11 B. T. A. 1040, 1162, " since it is the stock we are considering and not the corporation's tangible or intangible assets, we are not directly concerned with a method, like, for instance, that set forth in A. R. M. 34, 2 C. B. (1920) 31, for arriving at the value of good

will or other intangibles separately from the tangible or other assets, or a method for classifying or segregating the constituent parts which are reflected in the value of the stock representing the whole."

And, further, we are not particularly concerned with recommendations relied upon by petitioners which were made by various subordinates in the Bureau, but which were not accepted or acted upon by the Commissioner in determining the deficiencies here involved. Much is said by the petitioners with respect to conferences held in the Income Tax Unit and investigations made by revenue agents after the deficiency notices were issued; but suffice it to say that whatever conclusions were reached or recommendations made, they were not accepted by the Commissioner.

1. In short, the situation presented as to the first issue may be summarized as follows: For some 36 years prior to December 31, 1911, John Griffiths had been engaged in business as a contractor and builder, and during the seven or eight years immediately preceding December 31, 1911, he had associated with him in a partnership his son, George W. Griffiths, the two aforementioned individuals being the petitioners in these proceedings. On January 1, 1912, the partnership was succeeded by an Illinois corporation and stock of a par value of $35,000 was issued to the petitioners for the assets of the partnership and the remainder of the corporation's stock, $65,000, was paid for in cash by the petitioners. In 1922 a stock dividend was declared, which increased the outstanding stock to $1,000,000 and all of the stock continued to be held by the petitioners until September 5, 1923, though after March 1, 1913, certain gifts of stock were made by the father to the son. On September 5, 1923, the Illinois corporation was succeeded by a Delaware corporation in a reorganization through which the petitioners received preferred stock of a par value of $1,000,000 and common stock of a par value of $750,000 and $500,000 in cash for the stock held by them in the Illinois corporation. The Commissioner held that the foregoing transaction is governed by that part of section 202 (e) of the Revenue Act of 1921 as amended by the Revenue Act of March 4, 1923, which reads as follows:

* * * when property is exchanged for property specified in paragraphs (1), (2), and (3) of subdivision (c) as received in exchange, together with money or other property of a readily realizable market value other than that specified in such paragraphs, the amount of the gain resulting from such exchange shall be computed in accordance with subdivisions (a) and (b) of this section, but in no such case shall the taxable gain exceed the amount of the money and the fair market value of such other property received in exchange.

That is, as we understand the situation, the Commissioner determined that the aggregate readily realizable market value of the com-

mon and preferred stock of the Delaware corporation received by the petitioners on September 5, 1923, was in excess of the March 1, 1913, value of the stock of the Illinois corporation held by them on that date, and that accordingly the gain to them, under the above-quoted provision, would be limited to the cash received by them, namely, $93,000 in the case of George W. Griffiths and $407,000 in the case of John Griffiths.

In the first place, it is contended by the petitioners that the stock received did not have a readily realizable market value because of an alleged agreement existing between the father and son as to the sale of the stock. Conceding for the purpose of discussion that the instrument set out under paragraph numbered 19 of our findings together with certain ambiguous statements appearing in the record establishes that an oral agreement existed at the time of the reorganization of the nature set out in the written instrument, we fail to see why that would have any effect on the market value of the stock at that time. The agreement would not become operative until the death of John Griffiths and he was not only alive at the date of the reorganization, but also at the time of the hearing in these proceedings. Such agreement did not restrict sales of stock by John Griffiths and George W. Griffiths only agreed to buy " whatever stock may be owned by John Griffiths at the time of his death." When the reorganization occurred John Griffiths could have sold his stock without legal cause for complaint on the part of George W. Griffiths by virtue of the agreement and a similar freedom of action existed on the part of George W. Griffiths, who owned the remainder of the stock.

In the next place, the petitioners contend with much earnestness that a valuation of the stock of the Illinois corporation at March 1, 1913, based upon the five-year period prior thereto (including the operations of the partnership from March 1, 1908, to December 31, 1911, and those of the corporation from January 1, 1912, to March 1, 1913), shows a value for such stock in excess of a value for the stock of the Delaware corporation on September 5, 1923, and $500,000 in cash when such value is arrived at in a similar manner by taking the five-year period of operations immediately preceding September 5, 1923. The following computation is used by the petitioners in arriving at the average earnings for the five-year period ended March 1, 1913:

| | |
|---|---:|
| Total earnings of partnership from March 1, 1908, to December 31, 1911 (stipulated) | $428,530.74 |
| Combined earnings of partnership and corporation for the calendar year 1912 | 107,875.26 |
| Earnings of corporation—January 1, 1913, to March 1, 1913 | 898,655.37 |
| Total | 1,435,061.37 |
| Average for the five-year period | 466,690.35 |

While denying the materiality of the above earnings as a basis for valuing the stock at March 1, 1913, the Commissioner questions their accuracy, particularly for the period January 1, 1913, to March 1, 1913, and much of the evidence before us has to do with that feature. Specifically, what the petitioners contend in this connection is that no income is to be attributed to the partnership after the formation of the corporation, whereas the Commissioner maintains that the earnings for the period January 1, 1913, to March 1, 1913, are overstated to the extent of at least $475,578.78, which he considers as income of the partnership and therefore, even if we should adopt the method urged by the petitioners for valuing the stock, the earnings shown by the petitioners for that period should be reduced by the aforementioned amount. In further pursuance of the same method of valuation the Commisioner objects to the average net tangibles used by the petitioners for the five-year period in the amount of $466,690.35 on similar grounds. We have set forth in our findings the capital of the partnership at the beginning and end of the years October 31, 1907, to October 31, 1911, as stipulated by the parties, and as we understand the situation the parties are agreed that by the use of the foregoing stipulated amounts and taking into consideration the combined operations and assets of the partnership and corporation from October 31, 1911, to March 1, 1913, with appropriate adjustments, the average net tangible assets are as stated by the petitioners. Broadly speaking, the parties differ as to the continuing interest of the partnership in earnings and assets after it was succeeded by the Illinois corporation. We think it clear from the resolutions adopted at the time such succession took place that it was intended that all assets of the partnership would pass to the corporation and that all business thereafter would be carried on by the corporation, but we are likewise convinced that subsequent developments prevented the carrying out of the plan in all of its details. At the time of the formation of the corporation, the partnership had entered into a contract with the Netcher Estate for the construction of a section of the Boston Store. Prior to that time the partnership had constructed other parts of the same building and in awarding these contracts to the partnership the Netcher Estate relied much on the financial responsibility and reputation of the petitioners. Subsequent to the organization of the corporation, namely, March 21, 1912, supplemental contracts were entered into for another section to the Boston Store and certain other additions and the Netcher Estate insisted that these further contracts be executed by the partnership. In such work the Netcher Estate recognized only the partnership and looked to it for carrying out the terms of the contract. Slightly more than two-thirds of the cost

of completing the contracts executed in 1911 and 1912 applied to the 1912 contracts. The total profit on the projects was $610,055.22. The work under the contracts was practically completed in 1912 or at least prior to March 1, 1913. In 1914 John Griffiths withdrew $475,578.78 from the corporation, which was shown on its books as the partnership's share of the profit on the Boston Store contracts.

Much evidence was introduced by the petitioners for the purpose of showing that all profits under the Boston Store contracts as well as all other contracts completed by the corporation after its organization belonged exclusively to the corporation, but we are not convinced from what appears in the preceding paragraph and other evidence in the record that such is the case. From the maze of exhibits offered, including ledgers, journals, contract records, journal entries and adjusted journal entries, balance sheets and adjusted balance sheets, and other similar data, it is difficult to reach any conclusion other than that a very confused state of affairs existed and that certainly to some extent the partnership or the petitioners apart from the corporation were directly concerned in the activities carried on after the formation of the corporation. Whether the amount by which the corporation profits should be reduced in arriving at the average profits for the five-year period ended March 1, 1913, was $475,578.78, the amount contended for by the Commissioner, we do not find it necessary to determine. Suffice it to say that with a condition thus existing we see little that is helpful in the earnings presented as a basis for valuing even the assets of the corporation, much less the stock, which is our immediate concern. In this connection, it should be observed that approximately two-thirds of the earnings for the five-year period contended for as a basis of valuation by the petitioners fall within the two-month period ended March 1, 1913, thus indicating an abnormal situation as to earnings. What the petitioners seem to be trying to establish is a value of good will or intangibles in addition to the tangible assets and from these combined assets arrive at a value for the stock, but when we consider the very irregular earnings here presented, the confused state of affairs existing from January 1, 1912, to March 1, 1913, and the personal element involved on the part of the petitioners in earning the income, we think it open to serious question whether such earnings afford any guide as to a valuation of the good will of the business here involved. Cf. *White & Wells Co.* v. *Commissioner*, 50 Fed. (2d) 120. Much of any excess earnings over a fair return on tangible assets is certainly attributable to the efforts and reputation of the petitioners themselves, who were the sole stockholders of the corporation. An example of this personal element is shown in connection with the Boston Store contracts to which we have referred and we think a fair

conclusion from the record to be that other large contracts came to the corporation in a similar manner. A purchaser of the stock, particularly if the petitioners thereby became dissociated from the business, would therefore certainly not pay a price for the stock based upon prior earnings when an important element in the production of such earnings would, after acquisition of the stock, be no longer present in the corporation.

We have considered the question of earnings as indicative of value at some length, not only because of the earnestness with which it has been urged upon us by the petitioners as a method of valuing the stock in question, but also because the average earnings and average net tangible assets form the basis of the so-called expert testimony produced. There were no sales of the stock of either corporation in 1913 or 1923 and therefore the petitioners sought to value the stock not only on the basis of earnings (A. R. M. 34, *supra*), but also presented the testimony of three witnesses who testified as to the value of the stock of the Illinois corporation at March 1, 1913, and that of the Delaware corporation on September 5, 1923. However, when we come to analyze their testimony we find little in their qualifications or knowledge of stock values either in general or with reference to the particular stock here involved which would help us in solving the problem before us. As we said in *Keystone Wood Products Co.*, 19 B. T. A. 1116, the " force of the opinion is derived from the care and ability used in forming it," and " opinions as to value are in each instance not arbitrarily to be either rejected or accepted entirely, but are reasonably to be weighed with all the other evidence in accordance with the demonstrated qualifications of each witness to form an opinion." And, as the court said in the recent case of *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893; certiorari denied, 286 U. S. 545:

A jury need not accept the opinions of even a bevy of disinterested witnesses (*Head* v. *Hargrave*, 105 U. S. 45) ; nor need a judge, (*The Conquerer*, 166 U. S. 110, 131). It is hard to see why the Board should be more constrained; it acts as a judicial body. * * *

The first witness offered was Myron D. Goldberg, bank cashier, who had been in the banking business for some 25 years and had had some experience in valuing stock, though the extent is not shown. His valuations were based on what is referred to as a banker's or " rule of thumb " method by which the value of a business would be determined by taking ten times the average annual earnings over a five-year period. In answer to a hypothetical question in which it was considered that the average annual earnings for the five-year period ended March 1, 1913, were approximately $287,000 and that

for the five-year period ended September 5, 1923, were $230,000, he stated that in his opinion the value of the business on March 1, 1913, was $2,870,000, and on September 5, 1923, $2,300,000. The average earnings used at March 1, 1913, were those heretofore referred to as being contended for by the petitioners and which we have indicated our unwillingness to accept in their entirety, and the witness admitted that the personal element on the part of the petitioners was a factor to be considered in such valuation. While he testified that he knew the general reputation of the petitioners and the concerns with which they are or had been associated as contractors and builders, the knowledge seems to have been of the most general character. He knew nothing of the capital structure of any of the concerns and apparently did not consider such knowledge essential to a stock valuation; in other words, ten times the average annual earnings would show the value of a going business and the stock value would follow therefrom.

The next witness, O. P. Decker, was even less satisfactory than Goldberg. He was a young man 28 years of age, who had had a very limited experience in work which would qualify him to testify to the values with which we are concerned, and he had little knowledge of the petitioners' businesses here involved. His method was similar to that of Goldberg, namely, ten times the average earnings over a five-year period, and of course he reached a similar conclusion. He further stated that " the value of the business would not be influenced by the quantity of the tangible assets "; in other words, it would seem that giving to this witness the average earnings of a concern for a given period, the value of the business and its stock could be computed without difficulty. Simple, but how dependable and to what extent would a prospective purchaser invest funds therein on that basis?

The last witness offered in this connection was David Wyland, an accountant in the employment of Paysoff Tinkoff and Son Company, but we do not understand that it was purported to qualify him as an expert on stock values other than in the sense that an accountant might make a computation based upon a given statement of average earnings and net tangible assets—certainly, his experience as stenographer, auditor, and revenue agent in the Bureau of Internal Revenue and accountant for the period of two years since leaving the Government service would not seem to qualify him further. The factors used by him were the earnings and assets to which we have already referred and it is unnecessary to refer to the infirmities therein previously mentioned.

What the petitioners were seeking to establish by the above witnesses was that the stock of the Illinois corporation had a greater

value on March 1, 1913, than the stock of the Delaware corporation on September 5, 1923, when received by the petitioners, and in further support of that contention each of the witnesses was asked the following, or a similar, question:

Would the fact that there was a restrictive agreement existing between the sole stockholders, who were father and son, whereby the father had contracted not to sell the stock to anyone except the son during his lifetime, and in case of death, the son should purchase the same; would that affect your valuation, Mr. Wyland?

The purpose of the question was to show that since only a negligible intangible value appeared on the books of the corporations and since the agreement referred to contemplated the acquisition of the stock at book value, no intangible value or at least none of a substantial amount could exist after the agreement was entered into, which was subsequent to March 1, 1913. But even if we should concede that the existence of such an agreement would seriously impair intangible values otherwise existing and stock values based thereon (cf. *James Couzens*, 11 B. T. A. 1040, 1163), we fail to see the materiality of questions as to the effect of an agreement when it is not shown to have existed. The instrument which the petitioners presented related to an agreement whereby George W. Griffiths agreed to purchase whatever stock John Griffiths might own at the latter's death, and nowhere do we find any provision " whereby the father had contracted not to sell the stock to anyone except the son during his lifetime." John Griffiths was still living at the date of the hearing in these proceedings.

In view of the foregoing and a careful consideration of all evidence presented on this issue, we are of the opinion that the action of the Commissioner in considering that the stock of the Delaware corporation received by the petitioners on September 5, 1923, had a readily realizable market value at least equal to the fair market value of the stock of the Illinois corporation on March 1, 1913, should be sustained and that accordingly the cash received represents taxable gain to them. The determination of the Commissioner is prima facie correct and the burden of proving higher values or different values from those shown by the Commissioner is on the petitioners. *Avery* v. *Commissioner*, 22 Fed. (2d) 6. We do not think such burden is met by the character of evidence here presented; in fact, the record tends to favor rather than discredit the Commissioner's determination. The amounts included by the Commissioner as taxable gain to the petitioners of $93,000 and $407,000 are the amounts reported by them in their returns, and we think such a determination is amply supported by the record. A small number of shares of stock were received by George W. Griffiths in 1914 and 1915

as gifts from John Griffiths, which would be valued as of the date of acquisition (section 202 (a) (2) of the Revenue Act of 1921), but from the meager evidence submitted on this point we are not convinced that a value different from that used by the Commissioner may be applied. Some shares were also received by George W. Griffiths in 1923 as gifts from John Griffiths, but since these acquisitions took place after December 31, 1920, the basis would be the same as in the hands of the donor, who held the stock on March 1, 1913 (section 202 (a) (2), *supra*), and therefore what we have heretofore said as to the value of the stock on March 1, 1913, would be applicable to this stock.

2. The next issue is whether the Commissioner properly computed capital net gains for the year 1925 in the respective amounts of $155,157.28 and $679,021.64 in the cases of George W. Griffiths and John Griffiths on account of the redemption in that year of prefererd stock owned by them in the Delaware corporation. The entire issue of cumulative preferred stock of the Deleware corporation was called and retired on December 5, 1925, at $105 per share plus accumulated dividends. As a result cash was distributed to the preferred stockholders (petitioners in these proceedings) in the amount of $1,200,600, divided as follows:

| | |
|---|---:|
| Redemption of stock | $1,049,905.55 |
| Accumulated dividends | 150,694.45 |
| | 1,200,600.00 |

The preferred stock was acquired in 1923 at the time of the reorganization of the Illinois corporation, when $1,000,000 of common stock of that corporation was exchanged for $1,000,000 of preferred stock and $750,000 of common stock in the Delaware corporation plus $500,000 in cash. We held under the previous issue that the readily realizable market value of the stock of the Delaware corporation received by the petitioners was at least equal to the fair market value of the stock of the Illinois corporation held by them on March 1, 1913, and that therefore the entire amount of cash received was taxable to the petitioners. It was then unnecessary to determine the specific March 1, 1913, value of the stock, but in order to dispose of the present issue it becomes necessary to compare the March 1, 1913, value of the stock then held with the amount received in the retirement of the preferred stock in 1925, since the stock exchange in 1923 was considered nontaxable. The Illinois corporation had only common stock outstanding and therefore we must determine not only the value of that stock on March 1, 1913, but also what part of such value may be considered as allocable to the preferred stock which was issued by the Delaware corporation in 1923 and retired in 1925.

In computing the gain in question the Commissioner first determined stock values as follows:

| | |
|---|---:|
| March 1, 1913, value of all stock of the Illinois corporation_____ | $579,073.31 |

| | |
|---|---:|
| Value on September 5, 1923, of the common stock of the Delaware corporation_____ | $1,684,292.24 |
| Value on September 5, 1923, of the preferred stock of the Delaware corporation_____ | 1,000,000.00 |
| Total value of all stock of the Delaware corporation_____ | 2,684,292.24 |

In the above determination, the preferred stock of the Delaware corporation was assigned its par value, and the common stock of the Delaware corporation was given a value based upon the following computation:

| | |
|---|---:|
| Average earnings for five-year period as set forth in supplemental protest _____ | $261,786.53 |
| Deduct preferred stock dividend_____ | 70,000.00 |
| | $191,786.53 |
| Deduct earnings sufficient to give common stock a par value on basis of $10 per share_____ | 75,000.00 |
| | $116,786.53 |
| Capitalize balance at 12½%, gives an additional value of_____ | 934,292.24 |
| Add par value_____ | 750,000.00 |
| Total value_____ | 1,684,292.24 |

The March 1, 1913, value of the stock of the Illinois corporation as shown above is the same as the book value of assets of that corporation as set out in one of the numerous protests filed by or on behalf of the petitioners.

After determining the above values for the respective issues of stock, the Commissioner computed the amount of the March 1, 1913, value of the stock of the Illinois corporation allocable to the preferred stock of the Delaware corporation and the taxable gain to the petitioners on account of the redemption of the preferred stock as follows:

$\dfrac{\$1,000,000.00}{\$2,684,292.24}$ of $579,073.31=Amount of March 1, 1913, value of

| | |
|---|---:|
| the stock of the Illinois corporation allocable to the preferred stock of the Delaware corporation_____ | $215,726.63 |
| Distribution on Preferred (Exclusive of dividend)_____ | [1]1,049,905.55 |

[1] The Commissioner conceded in his brief that in accordance with the provisions of section 201 (c) and (g) of the Revenue Act of 1926 the accumulated dividends on the preferred stock paid at the time of its retirement should be considered as part of the full amount received in computing the capital net gain.

Less: Basis (above) _____ $215, 726. 63

Total gain_____ $834, 178. 92
John Griffiths_____ 81.40%___ 679, 021. 64

George W. Griffiths_____ 18.60%___ $155, 157. 28

Under the previous issue we pointed out some of the reasons why the evidence offered as to the value of the stock of the Illinois corporation on March 1, 1913, and that of the Delaware corporation on September 5, 1923, was not acceptable as showing that the former stock did not have a greater value than the latter on the respective dates mentioned. The same evidence is relied upon in connection with the present issue and it is, of course, unnecessary to repeat what has been said. However, when we consider the record before us in all of its ramifications (including the aforementioned evidence of value offered by the petitioners), we find ourselves unable to agree with the determination of the Commissioner on this point. In the first place, it appears that the Commissioner in order to reach the results obtained by him found that the total value of the stock of the Delaware corporation on September 5, 1923, was $2,684,292.24, whereas he found a total value for the stock of the Illinois corporation on March 1, 1913, of only $579,073.31, that is, approximately one-fifth of the former value. And when we come to examine the method by which these results were reached, we find that the 1913 valuation purports to be based upon book values, whereas the 1923 valuation is arrived at through a capitalization of average annual earnings over the five-year preceding period and thereby adding approximately $1,000,000 in the form of an intangible value to existing book values. The methods used are not only very different, but also, in the light of the record presented, we do not think the results may be supported. The stock of both corporations was closely held and we have no sales to serve as a guide to values. The corporations in which the petitioners held stock were a continuation of a business which has been in operation for 55 years. The books of the corporation showed good will on March 1, 1913, in the amount of $17,717.16 and at September 5, 1923, of $135,318.99. Apparently, both amounts were merely balancing figures and did not purport to represent actual values. How much good will or intangible value may attach to a business of this kind, or at least might be considered in determining the fair market value of the stock where so much of a personal element is involved, it is difficult to determine.

However, when we consider that the business had been in operation many years prior to March 1, 1913, and that practically the same organization existed on September 5, 1923, as on March 1, 1913, we are unwilling to accept a valuation which places a value on such intan-

gibles of approximately $1,000,000 at September 5, 1923, and practically leaves out of consideration intangibles at March 1, 1913. The net tangibles at August 19, 1923, were in the amount of $1,773,177.89, and we have already indicated our difficulty in arriving at the net tangibles at March 1, 1913, because of the mixed corporate and partnership relations on that date. As indicated above, the Commissioner used a net book value on March 1, 1913, of $579,073.31 which apparently included a good will value of $17,717.16, whereas the petitioners contend for net tangibles on that date of $900,944.17. Asset values back of stock are of course no infallible guide to the value of the stock itself, but, in closely held corporations where we have no sales, the values back of the stock may be used as an aid in determining fair market value. Cf. *George M. Wright*, 19 B. T. A. 541 (affd., 50 Fed. (2d) 727, and certiorari denied, Oct. 26, 1931). When we consider the earnings of the business prior to March 1, 1913, as well as prior to September 5, 1923, and the history of the business, we are convinced that some intangible value attached to the business and that it is unreasonable to find, as the Commissioner has found, that the intangible value was negligible at March 1, 1913, but had a value of approximately $1,000,000 on September 5, 1923.

After considering all the evidence of record, including the opinion evidence offered by the petitioner, the earnings prior to the two dates in question, the asset values, and the determination as made by the Commissioner, we have reached the conclusion that the fair market value of the stock of the Illinois corporation on March 1, 1913, was $1,000,000 and that of the Delaware corporation (including both common and preferred stock) on September 5, 1923, was $2,000,000, one-half of which should be allocated to common and one-half to preferred stock. Since one-half of the total value of both the common and preferred stock of the Delaware corporation on September 5, 1923, is attributable to the preferred stock, we think a reasonable allocation of the total March 1, 1913, value of the stock of the Illinois corporation of $1,000,000 would be in the same proportion, that is, $500,000 to the preferred stock, and $500,000 to the common stock. (Cf. *David B. Gann*, 23 B. T. A. 999.) John Griffiths held 81.4 per cent of the stock and George W. Griffiths, 18.6 per cent and therefore the part of the March 1, 1913, value allocable to the preferred stock which would be attributable to their respective interests would be $407,000 and $93,000. As shown in our findings, the total cash of $1,200,600 distributed in the redemption of the preferred stock was paid to the petitioners on the basis of their respective interests, John Griffiths receiving $977,288.40 and George W. Griffiths, $223,311.60. The capital gain realized is therefore $570,288.40 ($977,288.40 less $407,000) in the case of John Griffiths and $130,311.60 ($223,311.60 less $93,000) in the case of George W. Griffiths.

3. The third issue is the claim of petitioner John Griffiths that he is entitled to a deduction in 1925 of $100,000 on account of a loan in that amount to his son-in-law, Betancourt, in 1921, which petitioner says became worthless in 1925. The contention of the petitioner is that the transaction by which Betancourt received the $100,000 was entirely of a business character, that this petitioner determined in 1925 that he could never hope to recover any of it, and that therefore a deduction should be allowed as a worthless debt. We are not convinced that either premise upon which the conclusion is based is sound. In the first place, we can not overlook the relationship of the parties and the circumstances surrounding the advancing of the money. Of course, a man may make a loan to his son-in-law in the same business sense as to a stranger, but where the loan is made at the instigation of his daughter, where the son-in-law was without means to secure the loan and where the father made little or no investigation of the practicability or soundness of the scheme in which the funds would be used, we question the correctness of saying that a loss should be allowed when the scheme in which the funds are invested fails and the son-in-law fails to make repayment. An advance to the son-in-law or daughter would not be an allowable deduction when made, and likewise we think that a deduction may not be allowed on account of such advance when it is found that it can not be returned, even though it was hoped that it might be returned when made.

But even if we should say that there was a bona fide loan, we fail to see the justification for saying that it or any part of it became worthless in 1925. The loan was made in 1921 and the evidence indicates that Betancourt lost it long before 1925 and had no other assets from which recovery might have been had. The daughter had an annual income of $15,000 and had signed the note, but there is no indication that the father sought to have her make payment on the note. In fact, the endorsement on the note ("Pay to the order of Margaret G. Betancourt without recourse upon me. [Signed] John Griffiths."), which was explained by the father as being placed thereon "So that my daughter would not be annoyed by it in case of my death or harassed to be paid," would indicate that the father was unwilling to seek payment from one of the parties shown on the note as liable regardless of her financial condition. The observations of the Court of Appeals of the District of Columbia in the recent case of *Thom* v. *Commissioner*, 55 Fed. (2d) 1039, and which involved a somewhat similar situation, are here pertinent:

And our consideration of the record leads us to the same conclusion, for the taxpayer is neither required to be an incorrigible optimist and ignore the worthlessness of a debt that stares him in the face, nor to throw good money

after bad to get the judgment of a court and the failure of a sheriff to demonstrate a fact he already knows. *United States* v. *White Dental Co.*, 274 U. S. 398; *Selden* v. *Heiner*, 12 Fed. 2nd, 474.

But where the taxpayer, because of family ties or personal relations between himself and his debtor, is not willing to enforce payment of his debt, in whole or in part, he is not thereby entitled to deduct it from his income tax as worthless.

On the whole record, we are of the opinion that the deduction claimed may not be allowed either in whole or in part.

4. With respect to the deduction claimed by John Griffiths in 1925 on account of a loan of $5,000 to Thomas P. Shean in 1921, we are not convinced that the debt was ascertained to be worthless in 1925. The most we know is that the Shean Steel Window Company, of which the debtor and his son were the principal stockholders, was in bad financial condition in 1925, but it was apparently still in existence. Petitioner George W. Griffiths, who gave us the only information we have on this issue, was sure that the Shean corporation was in bad financial condition in 1925 and that Shean himself was not a man of financial responsibility, but he did not know whether the corporation's liabilities exceeded its assets. He further testified that the note with collateral attached was practically worthless in 1922 and 1923, stating that he might have given a hundred dollars for it in those years. The action of the Commissioner in disallowing the deduction is sustained.

5. A deduction is claimed by John Griffiths for each of the years involved on account of an automobile which he used partly for business and partly for pleasure. From the meager evidence submitted on this point, we are unwilling to say that the deductions allowed by the Commissioner are not sufficient to cover the amount allowable, and therefore his action is sustained.

6. With respect to the contentions of the petitioners that each of them is entitled to a deduction of $5,000 in 1925 on account of stock of the Espenhain Dry Goods Company, determined to be worthless in that year, and the further contention that George W. Griffiths is entitled to a deduction in 1925 on account of club dues, the evidence is either so unsatisfactory or so deficient that we are unable to make any findings on these issues or to reach any conclusion contrary to that followed by the Commissioner, and his action is accordingly sustained.

7. The final issue is whether the amounts expended by John Griffiths in 1924 in negotiating a lease on property owned by him should be allowed as a deduction in that year or should be allocated over the term of the lease and a pro rata part allowed as a deduction in each year. The Commissioner pursued the latter course,

which is in accordance with the decisions of the Board. *Central Bank Block Association*, 19 B. T. A. 1183; affd., 57 Fed. (2d) 5, and cases therein cited. The action of the Commissioner is accordingly sustained.

*Judgment will be entered under Rule 50.*

TRAMMELL did not participate in the consideration of or decision in this report.