Harold L. Kraus and Loma E. Kraus v. Commissioner.
Kraus v. Commissioner
Docket Nos. 5106-65, 6378-65.
United States Tax Court
T.C. Memo 1967-217; 1967 Tax Ct. Memo LEXIS 44; 26 T.C.M. (CCH) 1078; T.C.M. (RIA) 67217; October 31, 1967
John R. McDonald, 502 Exchange Bldg., La Crosse, Wis., for the petitioners. Denis J. Conlon and Alan B. Shidler, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in the income taxes of petitioners for the years 1961 and 1963 in the amounts of $1,379.06 and $260, respectively. Docket No. 5106-65 involved an issue as to whether petitioners are entitled to a new cost basis in the year 1961 with respect to certain shares of common stock. After review of the evidence presented at the trial, respondent now concedes that the petitioners are entitled to a new stepped-up basis and, therefore, recedes from his position *45 on that issue. This concession will be given effect in the Rule 50 computation. We must resolve two issues. (1) Are petitioners entitled to a $25,000 nonbusiness bad debt deduction in the year 1961? (2) If so, are petitioners entitled to a capital loss carryover in 1963? Findings of Fact Some of the facts have been stipulated by the parties and are found accordingly. Harold L. Kraus and Loma E. Kraus are husband and wife whose legal residence at the time the petitions were filed herein was La Crosse, Wisconsin. They filed joint Federal income tax returns for the years 1961 and 1963 with the district director of internal revenue at Milwaukee, Wisconsin. Harold L. Kraus (herein called petitioner) was engaged in the advertising business during the years in question. The parents of petitioner were Ben B. and Amanda M. Kraus. They resided for many years in Elkhorn, Wisconsin. Petitioner was their only child and their relationship with him was close - one of trust and confidence. During 1941, Ben B. and Amanda M. Kraus owned a farm located near Elkhorn, Wisconsin. Ben and Amanda wanted to transfer the farm to petitioner with the hope that the farm property would be kept in the *46 family and ultimately be passed to petitioner's two sons. At that time Amanda was approximately 60 years of age. On December 30, 1941, Ben B. and Amanda M. Kraus executed a deed conveying to petitioner their Elkhorn farm property. The deed shows that the property was conveyed for $1 and other valuable consideration and bears revenue stamps with a cost of $13.20. Petitioner did not, however, pay any cash to his father or mother for the transfer of the farm to him. On December 31, 1941, an agreement was entered into between petitioner and Ben B. and Amanda M. Kraus in the form of a lease, the substance of which entitled Ben and Amanda to have the right to the use of the farm property for a period of 12 years from December 31, 1941, to December 31, 1953, or to collect and receive all of the income therefrom for a period of 12 years, from December 31, 1941, to December 31, 1953. Petitioner had previously worked for his father and had been involved in business ventures with him. He was very familiar with his mother's financial affairs. He assisted his mother in the preparation of certain Federal and State income tax returns and he prepared the Wisconsin income tax returns which she *47 filed for the years 1947 and 1949. He knew that she had a safe deposit box and had gone to the box with her many times. He knew what was in the box. He was also aware of her problems in managing the farm property, particularly after the death of Ben Kraus in July 1945. When Amanda purchased stock she almost always discussed the purchases she would make with petitioner unless the purchase was one which involved less than $100. After Ben Kraus died, the petitioner was added as a signatory on the checking account of Amanda at the First National Bank of Elkhorn, Wisconsin. He was also named on the joint savings account of Amanda and himself as joint tenants at the First National Bank of Elkhorn. There were seven separate savings accounts on which he was named as a joint owner with Amanda at the First Federal Savings and Loan Association of La Crosse. The address listed on these joint accounts in the ledger account records of the bank was the address of petitioner in La Crosse. Petitioner was a signatory on joint accounts with Amanda at the Batavian National Bank in La Crosse. He was likewise a joint owner of numerous shares of stock with Amanda. From December 31, 1941, until November *48 1950, the farm property was continuously rented to or operated by sharecroppers. All of the income from the farm was received by Ben and Amanda Kraus until Ben's death in 1945; and thereafter Amanda received all of the income from the farm until it was sold on November 3, 1950. The agreement dated December 31, 1941, between Ben, Amanda, and petitioner was not changed, altered or amended in any way after Ben's death. From 1941 through 1963, petitioner resided in La Crosse. Since this was a considerable distance from Elkhorn, he attempted to influence Amanda to allow the sale of the farm property. At first Amanda refused to do so, but subsequently she relented and negotiations were commenced, culminating in the sale of the farm to Werner J. Ketterhagen on November 3, 1950, for $24,000. The proceeds of sale were deposited in the joint checking account of Amanda and petitioner at the First National Bank of Elkhorn. Subsequently, Amanda transferred the sales proceeds from the joint checking account to the joint savings account of petitioner and Amanda at the First National Bank of Elkhorn. Amanda retained the savings account passbook in her possession until her death on September 5, 1960. *49 When the farm property was sold on November 3, 1950, Amanda still had a 3-year unexpired term on the lease agreement which entitled her to the farm rental income until the stated expiration date of December 31, 1953. In his Federal income tax return for 1950 petitioner reported a gain from the sale of the farm property. He showed in his return that the selling price of the property was $24,000, that the farm cost him $20,500, and that he had made improvements on it in the amount of $1,550. After making the necessary depreciation adjustment, he reported a long-term capital gain on the sale of the farm of $4,510. In this 1950 Federal income tax return petitioner indicated that the farm was being held in trust by him. He described it in this manner in his tax return in order to show that his mother had the use of the income from the property at the time it was sold. After the sale of the farm on November 3, 1950, Amanda executed a note, dated December 22, 1950, in the amount of $25,000 payable to petitioner. The note made no provision for collateral security, installment payments or interest. The note form was secured by petitioner, and Amanda signed it at his residence in La Crosse *50 when she visited him for the Christmas holidays in 1950. Amanda was then 70 years of age. The term of the note was set at 20 years. It was agreed that no interest would be charged since Amanda was to receive income from the sales proceeds in lieu of the income she previously received from the farm. On or about February 19, 1960, petitioner's Wisconsin income tax returns were audited and a Wisconsin gift tax was assessed against him for the amount the auditor considered to be a gift from Ben and Amanda to him. The amount of the gift was determined by the auditor to be $8,500, representing the difference between the revenue stamps reflected on the deed from Ben B. and Amanda M. Kraus, dated December 30, 1941, and the amount of the cost basis reflected on petitioner's Federal income tax return for 1950, which was in the amount of $20,500. The auditor determined that a gift of the farm property to petitioner took place in 1950. Although the proceeds received from the sale of the farm were $24,000, an extra $1,000 was included therein to compensate petitioner for his efforts in selling it. The proceeds from the sale of the farm were placed in the joint bank accounts of petitioner and *51 Amanda. There was always $25,000 in such accounts to pay the note. On July 25, 1960, a residence at 215 Winsor Street, Elkhorn, Wisconsin, was conveyed by Amada M. Kraus to petitioner. On August 5, 1960, petitioner sold the property located at 215 Winsor Street for $19,500. During April 1960, Amanda was hospitalized because of general deterioration in her health due to her age. When she was released from the hospital, she moved to La Crosse and resided with petitioner until her death. This move was necessary because she was unable to live alone any longer. It was during this time when she was residing with petitioner that she executed the deed on July 25, 1960, conveying to him her real estate at 215 Winsor Street. Amanda was ill when the deed was prepared. When the house was conveyed to him, the petitioner already had an offer to sell the property for the amount of $19,500. Amanda executed her last will and testament on July 13, 1946. Her will provided for specific legacies to Douglas A. Kraus and Roger W. Kraus, the sons of petitioner, each in the amount of $1,000. The residue and remainder of her estate was devised and bequeathed to her son, the petitioner. Subsequent *52 to Amanda's death the petitioner filed on her behalf 1960 Federal and Wisconsin gift tax returns reporting her transfer of the house located at 215 Winsor Street, Elkhorn, Wisconsin, as a gift to him. The Federal gift tax return was signed by petitioner, showing Amanda's name under which he placed his own initials. The gift tax return filed showed the fair market value of the gift as $18,300 to reflect the net proceeds of the house which petitioner received, i.e., the gross sales price less expenses of sale. The Federal and State gift taxes shown on the returns were paid by petitioner. The estate of Amanda M. Kraus at her death on September 5, 1960, consisted of the following assets: $83,035.36
securities in name of Amanda M.
Kraus and Harold L. Kraus,
jointly.
32,669.98
savings and checking accounts in
the name of Amanda M. Kraus
and Harold L. Kraus, jointly.
1,498.75
securities in name of Amanda M.
Kraus.
Petitioner contributed nothing to the stocks he acquired as surviving joint tenant when his mother died. Petitioner was named executor of his mother's estate. He did not file a Federal estate tax return on behalf of her estate. He prepared *53 an inventory of the assets and liabilities of his mother. Since he was thoroughly familiar with her affairs, he believed that the inventory which he prepared listed all of her available assets. Although he realized the bulk of her estate was in joint tenancy, he filed a claim with the La Crosse County Court (Probate Court) because he believed such claim would be paid out of the joint tenancy property. The claim which petitioner filed in his mother's estate was allowed by the Probate Court in a nonadversary proceeding in which the only interested persons were the petitioner and his two sons. Petitioner personally assumed and paid to his two sons the specific legacies mentioned in his mother's will. As part of the summary settlement of the estate of Amanda M. Kraus, petitioner agreed to make up the deficit involved in the payment of the balance of the costs of administration and any other charges against the decedent, including the payment of the costs involved in the termination of the various jointly-owned personal property interests of the decedent. Amanda M. Kraus and petitioner both believed that the $25,000, kept at all times in joint tenancy in their names after the execution *54 of the note, would upon the death of Amanda satisfy petitioner of any and all obligations owed to him by Amanda. Amanda knew the rights of a joint tenant with respect to survivorship. She knew that when a joint tenant dies the survivor takes sole title to the property. When Amanda placed her various bank accounts and her stocks in joint tenancy with the petitioner, she knew that when she died the petitioner would take title to the property under his survivorship rights as to the jointly-held property. Neither Amanda nor petitioner had knowladge of the legal effect of a joint tenancy upon the creditors of a deceased joint tenant. Amanda was usually diligent in paying her debts and obligations promptly. In his notice of deficiency dated May 27, 1965, respondent disallowed the claimed nonbusiness bad debt deduction with the following explanation: It is determined that the deduction claimed in your return in respect of an alleged $25,000.00 nonbusiness bad debt arising with respect to a note receivable signed by Amanda Kraus, is disallowed because you have not established that you are entitled to such a deduction. Opinion Section 166(a)(1), Internal Revenue Code *55 of 1954, provides that there shall be allowed as a deduction any debt which becomes worthless within the taxable year. Whether a "debt" exists and whether it has become "worthless" are questions of fact. A nonbusiness bad debt is one which was not created or acquired in the course of the taxpayer's trade or business or the loss from the worthlessness of which was not incurred in the taxpayer's trade or business. Only a bona fide debt qualifies for purposes of section 166. In the facts herein the petitioner contends that a bona fide debtor-creditor relationship was created on November 8, 1950, between his mother, Amanda, and him; that the debt created was in the amount of $25,000; and that the $25,000 note given by Amanda to him became worthless in 1961. Arguing alternatively, respondent contends (1) that no genuine debtor-creditor relationship existed between Amanda and the petitioner; (2) that, if a debt did exist, the acquisition by petitioner of bank accounts, exceeding $25,000, in the names of Amanda and petitioner fully satisfied upon Amanda's death whatever debt she may have owed to him; (3) that the transfer of the house on July 25, 1960, by Amanda to petitioner was either *56 intended by her to satisfy whatever debt she may have owed to petitioner or was a fraudulent conveyance which petitioner, as executor of his mother's estate, should have attacked and set aside to satisfy a creditor's (his) claim; (4) that the petitioner forgave or discharged any debt which existed when he agreed to assume and pay all charges against Amanda; and (5) that petitioner has failed to prove that the debt became worthless in 1961. Careful consideration of what actually happened in this case raises a serious question in our minds whether a bona fide debt was ever created between Amanda and petitioner. There are several facts which under these circumstances seem to point to an intention not to create a genuine debtor-creditor relationship. The transactions were not at arm's-length, as between strangers, but between an elderly, widowed mother and her only son, who was motivated by a sense of compassion, fairness, and duty to his mother. Petitioner recognized his obligation to see that his mother received everything she was entitled to receive under the "lease" agreement, and he did not want to take advantage of her by cutting her off completely with no income when the farm *57 was sold. The $25,000 note given to petitioner by his mother contained no provision for security, it was non-interest bearing, it had no provision for installment payments and it had a 20-year maturity date. Cf. Estate of Carr V. Van Anda, 12 T.C. 1158, 1163 (1949), affirmed per curiam 192 F. 2d 391 (C.A. 2, 1951). Since the petitioner did not part with control of the $25,000 placed in various joint bank accounts with his mother, it is indeed questionable whether consideration was ever furnished by petitioner to establish a bona fide debt. In addition, the petitioner had no intention of enforcing collection on the note or, for that matter, any real expectation of repayment except for the money he would receive from the joint bank accounts upon his mother's death. Cf. Estate of Carr V. Van Anda, supra; and George W. Griffiths, 25 B.T.A. 1292, 1315 (1932), affd. [1934] 70 F. 2d 946 (C.A. 7, 1934). Nor is the Probate Court's "allowance" of his claim against the Estate of Amanda M. Kraus binding on this Court with respect to the validity of the "debt." See Commissioner v. Estate of Herman J. Bosch, 387 U.S. 456 (1967). *58 Notwithstanding our belief that no bona fide debt existed, we need not rest our decision solely on that ground. Even if we assume that a bona fide debt of $25,000 existed from November 8, 1950, we think such indebtedness was fully satisfied when Amanda died and the petitioner acquired the joint bank accounts totaling in excess of $25,000. The proceeds from the sale of the farm were first placed in a joint checking account in the names of Amanda and the petitioner. Subsequently, the funds were placed in various joint savings accounts in their names. Petitioner testified that Amanda knew the effect of the right of survivorship as it relates to joint tenancy property. She knew that, upon her death, her son would acquire absolute title to all of the jointly held property, including the various bank accounts. Hence, the crux of the issue here, as we see it, is whether Amanda intended that through the rights of survivorship the petitioner would be repaid any indebtedness arising from her note. Respondent asserts, and we agree, that the petitioner made his mother's intention manifest when he stated that Amanda, by the exercise of due diligence, always kept at least $25,000 in the joint *59 bank accounts, believing that the money would go to petitioner in repayment of her obligation upon her death. Petitioner said that he knew his mother intended to treat the joint bank accounts as a security device and as a means of repayment. [1] Thus petitioner did receive the proceeds from the bank accounts under his survivorship rights which, in substance, fully satisfied the debt. It is true that the petitioner was not allowed by the Probate Court to acquire the funds in the bank accounts as a "creditor" of his mother's estate because Wisconsin law provides that a surviving joint tenant becomes the absolute owner of property held in joint *60 tenancy, free of the claims of heirs and unsecured creditors of the deceased. Musa v. Segelke & Kohlhaus Co., 224 Wis. 432, 272 N.W. 657 (Sup. Ct. Wis., 1937). However, the incidence of Federal taxation depends upon the substance of what occurs and the substance here is that the petitioner was repaid any amounts owed him by his mother when he took upon her death the title to all of their jointly held bank accounts and securities. Indeed, it would be unrealistic for us to conclude that Amanda intended that the petitioner would not be repaid. The record shows that she was capable of handling her financial affairs. Petitioner testified that his mother was diligent in paying her bills on time. Amanda knew the effect of the right of survivorship as it relates to joint tenancy property. She did her best to assure petitioner that he would get at least $25,000 back upon her death by keeping at all times at least $25,000 in the joint bank accounts. Thus, when Amanda died, the petitioner did in fact take title to these bank accounts totaling in excess of $25,000, along with over $80,000 in jointly-held stocks, in full satisfaction of any "debt" arising from the note in question, *61 exactly as the parties intended he would. In other words, the joint bank accounts were, in essence, merely a security device designed to guarantee the payment of whatever amount Amanda owed the petitioner. Consequently, we believe the petitioner suffered no "bad debt" and the deduction claimed therefor was properly disallowed by the respondent. Petitioner relies heavily on this Court's opinion in Lena P. Wheeler, 40 B.T.A. 92 (1939). However, we think the facts of this case are clearly distinguishable from those present in the Wheeler case. In the first place, there was no problem in Wheeler concerning the existence of a bona fide debt. Secondly, there was no evidence in Wheeler to show that the wife's election to receive dower was intended by the parties to be treated as satisfaction of the outstanding debt. Respondent's remaining alternative contentions require no discussion. In view of our conclusion that the petitioners are not entitled to a nonbusiness bad debt deduction, it follows that no capital loss carryover to the year 1963 can be allowed. To reflect the issue conceded by respondent and the decision reached herein on the disputed issues, Decisions *62 will be entered under Rule 50. Footnotes
1. Petitioner testified as follows: MR. SHIDLER: Now, let me ask you, you filed a claim in the Probate Court for twenty-five thousand dollars, and this was based on your note that you were holding; and now, did you investigate the possibility of paying this claim? Were there any assets that you could look to that would be available to pay your claim? A. Yes, there was the - I had always believed that the twenty-five thousand dollars that she kept in the bank and which she always felt, well, that was there available to pay the note.↩