JUNE M. RODGERS AND ROBERT D. BARBER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rodgers v. Commissioner
Docket No. 1669-81.
United States Tax Court
T.C. Memo 1985-220; 1985 Tax Ct. Memo LEXIS 415; 49 T.C.M. (CCH) 1434; T.C.M. (RIA) 85220; May 8, 1985. G. Patrick Arnoult, for the petitioners. Cynthia M. Odle-Schlechty, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a deficiency of $19,980.54 in income tax due from petitioners for 1976. Petitioners claim an overpayment of $27,409.72 for the same year. After concessions, the issue for our decision is whether petitioners are entitled to a nonbusiness bad debt deduction for amounts advanced by June M. Rodgers to or for the benefit of her former husband, Allen C. Smith. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by *416 reference. Petitioner June M. Rodgers resided in Memphis, Tennessee, and petitioner Robert D. Barber resided in Odessa, Texas, at the time they filed their petition. Petitioners were husband and wife during 1976 and filed a joint return for that year with the Internal Revenue Service Center in Memphis. Robert D. Barber is a petitioner solely because of the joint return. Consequently, hereinafter the word "petitioner" shall refer to June M. Rodgers. From 1951 to 1954 petitioner was employed by the Trustee for Shelby County, Tennessee. In 1954, she went into business with her brother in the operation of a sundry store, where she remained until 1963. In 1963 petitioner bought her first restaurant, a Kentucky Fried Chicken franchise located in West Memphis, Arkansas. It was successful and thereafter she joined a group which acquired several other wentucky Fried Chicken outlets in the Memphis area and elsewhere. Through her connections with Kentucky Fried Chicken, petitioner met Dave Thomas, who was then in the process of founding Wendy's. She invested $50,000 in Wendy's, purchased a franchise, and opened one of its restaurants in Memphis. Over the years, petitioner was personally *417 involved in the day to day operations of the restaurants. She arranged any financing necessary for their acquisition or operation. She also executed a number of promissory notes, using her assets as collateral. These generally were installment notes requiring monthly payments. From 1963 through 1973 petitioner realized substantial income from her business ventures and investments and she frequently sought professional advice concerning the purchase and sale of stock and other investments, financing for the business ventures, and the preparation of her tax returns. By 1973, she had accumulated a substantial amount of assets. In December of 1973, petitioner married Allen C. Smith, the sole proprietor of a vending machine business called Allen Smith Enterprises. Prior to their marriage petitioner had conversations with Smith about his business, its nature, value, and extent. He drove her around Memphis and pointed out several parcels of real estate he claimed to own as well as numerous places whre he claimed to have vending machines on location. At that time she was satisfied that Smith was a wealthy, successful businessman with assets of more than $1,000,000. About two weeks *418 before their marriage on December 6, 1973, petitioner gave Smith a check for $50,000 when he told her he was temporarily unable to pay for some vending equipment he had ordered because an officer at his back had retired and the bank had reduced "his borrowing power." Smith told petitioner that he had always repaid his loans to the bank and he did not know why the bank stopped lending him money, but it would only take approximately six months "to get back on my feet" and repay the loan. In return for the check which was dated November 27, 1973, Smith gave petitioner a demand note dated November 27, 1973 bearing interest at six percent per annum. On December 18, 1973, petitioner gave Smith a check for $1,500 to upgrade his membership at the Colonial Country Club. Petitioner assumed that this check also represented a loan because it was Smith's separate membership and he promised to repay her in January of 1974 but she did not request or receive a note, there was no agreement as to interest, and the check bears no notation as to the nature of the transaction. On December 22, 1973, petitioner and Smith attended a Christmas party for the employees and associates of Allen Smith Enterprises. *419 Curley Dickens, the former owner of the business, was also present. During the party dickens assured petitioner that Smith's business was doing well and that it would do even better during the following year. After the party, Smith called petitioner into his office and told her that another shipment of vending equipment had arrived and that he needed an additional $50,000 to pay for it. Petitioner, feeling that the business was doing well, agreed to lend Smith the additional funds. Smith again gave petitioner a note but it contained no interest rate or due date. In early February of 1974, Harry Barrell, the manager of a Chicago vending machine company with which Smith had business dealings, agreed to work for Allen Smith Enterprises in an effort to improve the company's financial condition. Shortly thereafter Barrell assured petitioner that it his opinion Smith had adequate assets to pay all of his creditors including her and that the business was going to become very profitable. Despite these forecasts, Barrell informed petitioner before the end of the month that the company had an acute shortage of cash and needed $25,000 immediately in order to meet a payroll. At this time *420 petitioner knew that without the requested $25,000 the business would probably fail and she might not recover the funds already advanced by her but with further assurances from Barrell and Smith, she felt that the business would do well in 1974 and that she would be repaid. Consequently she gave Smith a check dated February 28, 1974 for $25,000 bearing a notation that it was a loan and in return received from Smith a promissory note dated March 1, 1974, in the amount of $25,000 which was payable on demand with interest at seven percent per annum. Approximately two weeks later Barrell informed petitioner that the business was in worse condition than he had originally thought and it needed another $100,000. She refused to advance any more money and shortly thereafter Barrell left the business and returned to Chicago. After Barrell's departure a Mr. Mullinex became the manager of Allen Smith Enterprises at the insistence of some of Smith's creditors but the financial problems of the company continued throughout 1974 and into 1975. In June of 1975 petitioner accompanied Smith to the office of an attorney, who advised Smith to file a voluntary petition in bankruptcy. On July 11, 1975, Smith *421 filed such a petition with the United States District Court for the Western District of Tennessee in which he reported assets of $171,862.14 and liabilities of $889,970.09. In schedules attached to the petition, petitioner was listed as a secured creditor in the amount of $6,000 and as an unsecured creditor in the amount of $127,000. [1]
The secured debt of $6,000 was represented by a note payable to the Memphis Bank & Trust Company by Smith and Curley Dickens which Mullinex, Dickens, and the bank had persuaded petitioner to co-sign in January of 1975 so that Dickens could be released from liability on the note. Petitioner signed the note and pledged her personal savings account at the bank as collateral because she felt an obligation as Smith's wife to honor the debt. In July of 1975, the bank collected the note from petitioner's savings account. Petitioner's status as a secured creditor was later challenged and defeated in the bankruptcy *422 proceeding. The first meeting of creditors in Smith's bankruptcy proceeding was held on July 28, 1975. Notice of the meeting was mailed on July 16, 1975 to all creditors named on the schedules, including petitioner. Petition did not attend the meeting and did not file a claim as a creditor with the bankruptcy court. As his financial condition worsened, Smith's personal life and his relationship with petitioner deteriorated. He quit going to work and began spending the afternoons in bars. On several different occasions, she attempted to discuss with him his financial condition and his ability to repay her. At Such times, he became abusive and angrily assured her that she would be repaid. They separated on October 29, 1975 and she obtained a final decree of divorce on March 15, 1976. An order discharging Smith's debts was entered by the bankruptcy court on May 12, 1976 and the bankruptcy proceeding was closed on January 11, 1979. Petitioner received nothing because she had not filed a claim. If her claim had been filed and allowed she would have received about $1,500 on a claim of $125,000. She did not file a claim because she thought it was not necessary since she was *423 listed as a creditor in the bankruptcy petition. OPINION The parties agree that petitioner made a series of nonbusiness advances to Smith on the dates and in the amounts shown below: Date
Amount
11/27/73
$ 50,000
12/18/73
1,500
12/22/73
50,000
02/28/74
25,000
07/21/75
6,000
TOTAL
$132,500
They also agree that under section 166(d)(1)[2] nonbusiness bad debts are deductible as short term capital losses in the year in which they become wholly worthless. Respondent, however, first contends that petitioner is not not entitled to a bad debt deduction for the advances because they were not loans but gifts, or if they were loans when made, petitioner later forgave them by failing to pursue collection. Respondent also argues that even if the advances were bona fide loans they did not become wholly worthless in 1976. Petitioner contends that each *424 of the advances constituted a bona fide loan, that she never forgave any part of such loans, that all of the loans became wholly worthless in 1976, and that she is entitled to their deduction in 1976 as nonbusiness bad debts under section 166(d)(1). Petitioner has the usual burden of establishing that the advances were bona fide loans and that they became worthless in 1976. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). In addition, in this case, petitioner has to overcome a presumption that intrafamily transfers do not constitute bona fide loans. Rude v. Commissioner,48 T.C. 165, 172 (1967); Estate of Van Anda v. Commissioner,12 T.C. 1158 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). [3]
In Estate of Van Anda v. Commissioner,supra at 1162, we stated the applicable law to be as follows: It is elementary that *425 one of the essential prerequisites for a bad debt deduction is that the debt must have an existence in fact. Luke & Fleming, Inc.,1 B.T.A. 12; Emil Weitzner,12 B.T.A. 724. We have stated that the existence of an obligation is the sinequanon of a debt. Emil Weitzner,supra.The giving of a note or other evidence of indebtedness which may be legally enforceable is not in itself conclusive of the existence of a bona fide debt. Hattie Wolff,26 B.T.A. 622; George W. Griffiths,25 B.T.A. 1292; C. B. Hayes,17 B.T.A. 86. It must be clearly shown that it was the intention of the parties to create a debtor-creditor status. C. B. Hayes,supra;Shiman v. Commissioner, 60 Fed. (2d) 65; Montgomery v. United States,23 Fed. Supp. 130; certiorari denied, 307 U.S. 632; E. J. Ellisberg,9 T.C. 463. Intrafamily transactions are subject to rigid scrutiny, and transfers from husband to wife are presumed to be gifts. However, *426 this presumption may be rebutted by an affirmative showing that there existed at the time of the transaction a real expectation of repayment and intent to enforce the collection of the indebtedness. Jacob Grossman,9 B.T.A. 643; Elizabeth N. C. Hetherington,20 B.T.A. 806, Helen E. Leatherbee,34 B.T.A. 196; W.F. Young, Inc. v. Commissioner, 120 Fed. (2d) 159. Factors which have been considered in determining whether a bona fide debt exists as the result of a transfer between related parties include: (1) the presence or absence of documentary evidence of the transaction, (2) whether there is a fixed schedule for repayment, (3) whether interest is required on the debt, (4) whether collateral is obtained or requested, (5) whether demand for repayment was made, (6) whether the transaction is reflected as a debt in the records of the parties, and (7) the financial condition of the debtor at the time of the alleged loan. [4]
*427 From the record as a whole we are satisfied and so find that the advances made by petitioner to Smith on November 27, 1973, December 22, 1973 and February 28, 1974 constituted bona fide loans. Petitioner testified that on November 27, 1973, about two weeks before they were married, she advanced $50,000 to Mr. Smith because she was convinced from that he had told her that he owned assets having a value of more than $1,000,000 and that he would repay her in not more than six months. With respect to the $50,000 advance on December 22, 1973, she testified that it was made after she was assured by Smith and the former owner of his vending machine business that he had assets in sufficient amounts to repay her and that the business operation would be profitable in 1974. She admitted that when she made the $25,000 advance on February 28, 1974 she was aware that the business did not have sufficient cash to meet a current payroll but she was assured by Mr. Barrell, the new manager, that in spite of the cash shortage the business had other adequate assets to meet its obligations and the prospects of the business were good for the immediate future. She was also led to believe that if the *428 additional $25,000 in cash was not advanced the business would fail and she would not be able to recover the advances she had already made. With hindsight it is apparent that financially petitioner would have been better off if she not made any of the advances to Smith. However, the advances must be viewed under the circumstances which existed at the time they were made. Her testimony with respect to the circumstances which then existed as well as to her intention at that time was forthright and credible. From it we concluded that on the date of the first two advances petitioner, a mature, experienced, and highly successful businesswoman believed that she was making advances to a successful businessman who owned assets having a value in excess of $1,000,000 and who was able to and would repay her. When the $25,000 was advanced on February 28, 1974 she knew Smith did not have sufficient cash to meet a current payroll but she was assured by his new manager that the non-cash assets of the business were still adequate to protect her and that the future prospects of the business were good if the payroll was met. She concluded in effect that the advance of the $25,000 was worth the *429 risk because to refuse it would probably result in a total loss of the advances which she had already made. Our conclusion that these three advances constituted valid loans is further supported by our finding that all three of these advances were represented by promissory notes signed by Smith, two of which, the first and the third, were complete in the sense that they contained a definite date of payment (on demand) of the principal amount plus interest at a stated rate. The second note did not contain a due date or a rate of interest but was executed and given by Smith to petitioner who had possession of the same thereafter. Furthermore, all three advances were made by checks on which petitioner noted that they represented loans. The advances were also shown as loans on the business trial balance of Smith for December 31, 1975 and were shown as loans payable in his bankruptcy petition. With respect to the other two advances, i.e., the $1,500 on December 18, 1973 and the $6,000 in January of 1975, petitioner has failed to carry her burden of establishing that these constituted valid debts. First the record contains no note or other document signed by Smith indicating the nature *430 of the $1,500 transaction. Furthermore, petitioner's check for the advance does not bear a notation that it represented a loan and petitioner testified that she just "assumed it was a loan" because the club membership for which it was given belonged to Smith. However, the relative smallness of this advance, plus the fact that it was made 12 days after their marriage and seven days before Christmas, and was not made in connection with Smith's business, definitely indicates that it was a gift and not a loan. The $6,000 advance made in July of 1975 occurred when petitioner had to pay a note which she had co-signed with Smith in January of 1975. She signed this note several months after she had concluded that no further loans to Smith were justified. She testified that she signed it in order to obtain the release of Curley Dickens from liability on the note because she felt obligated to do so as Smith's wife. To establish a bona fide debt existed as a result of this transaction petitioner must show that she had a real expectation of repayment by Smith. Rude v. Commissioner,48 T.C. 165 (1967). With petitioner's admitted knowledge of Smith's dire financial condition *431 at the time she co-signed the note, coupled with her motive for signing the note, we are unable to find that she had such an expectation on the $6,000 note and therefore petitioner is not entitled to a bad debt deduction for this advance. We have found that $125,000 of the advances made by petitioner to Smith were bona fide debts. We must now determine whether the debts became wholly worthless in 1976. This is a question of fact on which petitioner also has the burden of proof. Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972); Rule 142(a). A debt becomes wholly worthless then there is no longer any reasonable ground for hope of repayment in the future. Dallmeyer v. Commissioner,14 T.C. 1282, 1291 (1950). In other words, it occurs in the year in which the debt loses its "last vestige of value." Bodzy v. Commissioner,321 F.2d 331, 335 (5th Cir. 1963). [5] This usually entails proof of an identifiable event demonstrating the loss of value for the debt. Dustin v. Commissioner,supra. *432 In determining the date of worthlessness, all pertinent evidence including the financial condition of the debtor must be considered. Riss v. Commissioner,478 F.2d 1160, 1166 (8th Cir. 1973); Dallmeyer v. Commissioner,supra.
Bankruptcy has been considered an identifiable event which demonstrates worthlessness of at least part of an unsecured and unpreferred debt. Depending upon the circumstances the debt may become worthless before conclusion of the bankruptcy matter and the fact that proceedings are not formally terminated until a later year does not by itself shift the deduction to that year. Section 1.166-2(c), Income Tax Regs.
In this case Smith filed a voluntary petition in bankruptcy on July 11, 1975. The first meeting of his creditors was held on July 28, 1975 pursuant to a notice issued on July 16, 1975. Petitioner did not file a claim for her advances because she thought such action was not necessary since she was *433 listed as a creditor in the petition. The order discharging Smith's debts was entered on May 12, 1976 and his bankruptcy proceeding was formally closed on January 11, 1979. Petitioner received nothing from the bankruptcy proceeding because of her failure to file a claim. On brief she admits that she would have received $1,500 if a claim had been filed for $125,000 and to this extent she is not entitled to a bad debt deduction. The debts due petitioner by Smith became uncollectible upon the expiration of the period within which she could file a claim against the bankrupt estate. Under the Bankruptcy Rules then in effect this occurred on January 28, 1976, six months after the date set for the first meeting of creditors. Bankruptcy Rule 302(e) (1982). At that time petitioner's claim against Smith lost its last vestige of value. Bodzy v. Commissioner,supra.Furthermore, any attempt by petitioner to pursue collection beyond this point would have been a useless act. Sherman v. Commissioner,18 T.C. 746 (1952). We conclude, therefore, that petitioner is entitled to a bad debt deduction in 1976 under section 166(d)(1) for the amount of the *434 advances which constituted valid debts ($125,000) less the amount ($1,500) she would have recovered if she had filed a timely claim in the bankruptcy proceeding. See Rev. Rul 71-577, 1971-2 C.B. 129. See also United States v. White Dental Co.,274 U.S. 398 (1927). Decision will be entered under Rule 155.
Footnotes
1. The record is unclear concerning the method by which Smith arrived at the amount of $127,000 which first appeared on the trial balance of Allen Smith Enterprises for December 31, 1975 as "Notes Payable - Mrs. Allen Smith - $127,000."↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, less otherwise indicated. All rule referces are to the Tax Court Rules of Practice and Procedure.↩
3. See also Marlett v. Commissioner,T.C. Memo. 1976-105↩.
4. See Schmieder v. Commissioner,T.C. Memo. 1984-56; Goldstein v. Commissioner,T.C. Memo. 1980-273↩.
5. See Estate of Mann v. United State,731 F.2d 267↩ (5th Cir. 1984).