*Decision will be entered under Rule 50.*

ELIZABETH N. RUDE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6380–65.    Filed May 16, 1967.

*Harry C. Cogen* and *A. Calder Mackay*, for the petitioner.
*James J. Cotter*, for the respondent.

DAWSON, *Judge:* Respondent determined the following income tax deficiencies against petitioner:

| Year | Deficiency |
| --- | --- |
| 1960 | $6,879.18 |
| 1961 | 18,252.72 |
| 1962 | 1,648.84 |

Certain issues have been conceded by the parties, thus leaving for our decision the following questions:

(1) Was the petitioner entitled to a $100,000 nonbusiness bad debt deduction in the year 1959 for a debt the petitioner claims her former husband owed her for the purchase of his interest in real property and which allegedly became worthless in that year? If so, was the petitioner entitled to a capital loss carryover from 1959 to 1960 and 1961?

(2) Was the petitioner entitled to a $23,266.83 nonbusiness bad debt deduction in the year 1961 for paying such amount to satisfy an outstanding joint Federal income tax assessment for the year 1951 and for which she held a worthless right of contribution against her former husband?

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Elizabeth N. Rude (hereinafter called petitioner) is a single person who, at the time of filing her petition herein, was a resident of Los Angeles, Calif. She filed her individual Federal income tax returns for the years 1960, 1961, and 1962, as well as her amended return for 1960, with the district director of internal revenue at Los Angeles, Calif.

Petitioner and Jack L. Rude (hereinafter called Jack), her former husband, were married on April 6, 1930. They had three children.

Petitioner acquired real property, commonly known as the Vernalis Farms (hereinafter called Vernalis), by deeds dated December 19, 1949, and recorded January 31, 1950. Vernalis is some 890 acres of farmland situated in Stanislaus and San Joaquin Counties, Calif. Petitioner advanced $59,081.11 out of her own separate estate to acquire title in Vernalis. None of the purchase price was paid by Jack. Petitioner conveyed to Jack an undivided one-half interest in the Vernalis property by two grant deeds dated February 1, 1950. U.S. revenue stamps in the total amount of $102.30 were attached to the deeds. Both of the deeds contained the following language:

The Grantee in this deed named agrees to assume and pay one-half of all liens and encumbrances effecting the full interest in the real property (hereinabove described), and the acceptance of this deed shall be considered as an assumption by the Grantee of one-half of all liens and encumbrances existing on and relating to said real property.

On or about January 1951, petitioner and Jack each acquired an undivided one-fourth interest in the property commonly known as Victoria Island Farms (hereinafter called Victoria). The remaining one-half interest was acquired by the Bank of America as contemplated trustee for a family trust to be established in accordance with an agree-

ment between petitioner and her father. Petitioner advanced $200,000 out of her own separate estate to acquire these two undivided one-fourth interests in Victoria. No part of the purchase price was paid by Jack.

On or about August 1, 1951, the Bank of America conveyed its undivided one-half interest in Victoria to petitioner and her father as joint trustees. On December 13, 1951, they, in turn, executed a deed conveying an undivided eleven twenty-eighths interest in Victoria to Jack as trustee. On January 2, 1952, petitioner and Jack each executed a deed to an undivided three twenty-eighths interest in said property in favor of Jack as trustee. On the same date (Jan. 2, 1952) petitioner and her father, as joint trustees, executed a deed in favor of Jack as trustee of the remaining undivided three twenty-eighths interest in Victoria which they held in trust. Thus, as of January 2, 1952, the trust held an undivided five-sevenths interest in Victoria while the petitioner and Jack each held a one-seventh interest therein.

Subsequently, by a deed recorded March 8, 1957, Jack transferred 10 percent of his undivided one-seventh interest in Victoria to his daughter, Judith Rude Nobile, leaving him with an undivided nine-seventieths interest in that property. On the same date Jack also conveyed 10 percent of his undivided one-half interest in Vernalis to Judith Rude Nobile.

When Jack acquired his interests in Vernalis and Victoria he did not execute a note to petitioner and there is no written agreement with respect to his payment for them. Prior to the entry of an interlocutory judgment of divorce in 1958, the petitioner never demanded any repayment from Jack, although she anticipated eventual repayment out of the income from such properties.

Petitioner and Jack separated on or about November 1, 1955. On January 12, 1956, petitioner instituted an action for divorce against Jack in the Superior Court of the State of California. On May 27, 1958, an interlocutory judgment of divorce was issued by that court. The interlocutory judgment approved and incorporated all the terms of a property settlement agreement which petitioner and Jack had entered into on May 21, 1958. The property settlement agreement provides, in pertinent part, as follows:

ARTICLE I

B. The parties hereto do hereby confirm and acknowledge that the interests of the Husband and the Wife in each of said farm properties [Vernalis and Victoria] were originally acquired with funds that were the sole and separate property of the Wife. The parties do further confirm and acknowledge hereby that at the time of the acquisition of each of said farm properties the interests were acquired by or transferred to the Husband pursuant to an agreement that he would pay to the Wife his proportionate share of the original cost of said

properties, no part of which has been paid to date. The Husband, therefore, covenants and agrees to pay to the Wife the following amounts for his interest in each of said farm properties, payment for which will be made in the manner and upon the terms in this Agreement hereinafter set forth:

| | |
|---|---|
| For his interest in Victoria Island Farms | $100,000 |
| For his interest in Vernalis Farms | 30,000 |
| Total | 130,000 |

C. The parties further acknowledge that prior to the commencement of said divorce actions, the Wife did loan and advance, out of her separate funds, to Victoria Island Farms the sum of $100,000.00, which loan is evidenced by a promissory note which provides for the payment of interest at the rate of 5% per annum and the principal of which obligation is due and payable on or about December 31, 1959. The Wife hereby agrees to sell, transfer and assign, without recourse, to the Husband, and the Husband hereby agrees to purchase, said promissory note and the obligation evidenced thereby for the sum of $100,000.00, plus accrued interest, payment for which will be made at the time, in the manner, and upon the terms as in this agreement hereinafter specified.

D. The Husband further covenants and agrees to pay to the Wife the sum of $100,000.00, which sum shall be payable at the time, in the manner, and upon the terms in this agreement hereinafter set forth, and which sum shall be in full release and discharge of all marital and property claims of the Wife against the Husband.

E. The Wife hereby covenants and agrees to sell and convey to the Husband, and the Husband hereby agrees to purchase, all of the Wife's right, title and interest in and to said farm properties for the sums as follows:

| | |
|---|---|
| For the Wife's undivided ½ interest in Vernalis Farms | $135,000.00 |
| For the Wife's undivided ⅐ interest in Victoria Island Farms | 81,000.00 |
| Total | 216,000.00 |

Said total sum of $216,000.00 shall be paid by the Husband to the Wife at the time, in the manner, and upon the terms as in this agreement hereinafter set forth.

F. The terms and provisions of paragraphs B, C, D and E of this Article I shall be subject to and conditioned upon the ability of the Husband to acquire, pursuant to contemporaneous agreements, the two-sevenths beneficial interest of S. Tilden Norton in Victoria Island Farms and, with the approval of the Court, the three-sevenths beneficial interests of the three children in Victoria Island Farms now held in trust * * *.

### ARTICLE II

The total amount which the Husband, pursuant to Article I hereof, agrees to pay the Wife, to wit, the sum of $546,000.00 shall be payable as follows: Cash in the sum of $226,000.00, which shall be allocated as follows: $100,000.00 to the purchase of the promissory note referred to in Article I, paragraph C, $100,000.00 to the settlement figure referred to in Article I, paragraph D, and $26,000.00 on account of the acquisition of the properties mentioned in Article I, paragraphs B and E, and the balance of $320,000.00 to be evidenced by two promissory notes,

dated as of the close of the escrow hereinafter provided for, executed by the Husband in favor of the Wife, as follows:

\* \* \* \* \* \* \*

E. The provisions of Article I and Article II with respect to the purchase and acquisition by the Husband of the respective interests of the Wife and of the said S. Tilden Norton and the three children in and to the Vernalis and Victoria Island Farm Properties shall be subject to and conditioned upon the Husband obtaining new loans on each of said properties satisfactory to him from a bank and/or insurance company not later than July 15, 1958. In the event the Husband fails or neglects to consummate such refinancing transaction on both properties as aforesaid, then the provisions of Article I and Article II with respect to the Husband's purchase and acquisition of the respective interests of the Wife and the said S. Tilden Norton and the three children in both the Victoria Island Farms and Vernalis Farms properties shall be null and void and the alternative provisions of Article III hereof shall become operative and effective.

\* \* \* \* \* \* \*

## ARTICLE III

In the event the Husband fails to consummate the settlement with and the purchase of the respective interests of the Wife, the said S. Tilden Norton, and the three children, in the manner and upon the terms described in Article II hereof, and said Article II becomes null and void, as therein provided, then the parties agree as follows:

\* \* \* \* \* \* \*

B. Notwithstanding anything to the contrary herein contained, the parties hereby agree that the respective interests of the Husband in said farm properties, to wit, an undivided one-half interest in Vernalis Farms and an undivided one-seventh interest in Victoria Island Farms, are hereby confirmed and it is agreed that judgment shall be entered in the pending Los Angeles Superior Court action confirming such interests.

\* \* \* \* \* \* \*

D. The Husband hereby agrees to pay to the Wife, in full settlement and discharge of the claim she may have or assert against the Husband by reason of the acquisition of his interests in said farm properties and in full settlement and discharge of all other marital or property rights that she may claim against the Husband, the total sum of $100,000.00 \* \* \*.

\* \* \* \* \* \* \*

## ARTICLE XIII

Each of the parties hereto agrees to bear and discharge any income taxes heretofore or hereafter assessed or levied by the United States Government or the State of California against each of them respectively together with all penalties and interest, and in the event of any assessment or levy by either of said taxing agencies against both parties jointly or by reason of the filing of a joint income tax return or returns each of the parties will pay and discharge his or her proper share thereof. Nothing herein contained shall prevent either party from taking all proper legal steps and proceedings to contest any such levy or assessment or from compromising or settling any tax liability asserted by either the United States Government or the State of California.

Jack failed to consummate the refinancing by July 15, 1958, in accordance with paragraph E of Article II. Therefore, Articles I and

II became null and void and the alternative provisions of Article III became operative.

On May 8, 1956, a receiver was appointed in the divorce proceeding to administer Jack's nine-twentieths interest in Vernalis, his nine-seventieths interest in Victoria, and his personalty attached thereto. This receivership continued in force until after the sale of Victoria in 1965, although a Los Angeles law firm acquired his entire interest in the real property of Vernalis and Victoria by a foreclosure sale in November 1959.

Jack was employed as manager of Vernalis and Victoria by the receivership. Following Jack's embezzlement of funds belonging to the receiver, Jack went to Europe in December 1958 and established residence in England. As of the date of the hearing (Dec. 15, 1966) in this case, he still resided in England.

With the exception of amounts collected by the petitioner through subsequent writs of execution, Jack had no other property or assets in the United States after the foreclosure sale of his real property interests in Vernalis and Victoria. The writs of execution were issued pursuant to the divorce judgment to enforce the terms of Article III, paragraph D, of the property settlement agreement. Under the writs of execution the petitioner received the following amounts:

| Date | Amount |
| --- | --- |
| May 29, 1961 | $2, 047. 05 |
| Feb. 9, 1962 | 4, 472. 50 |
| Nov. 7, 1962 | 1, 774. 97 |
| 1965 | 1, 899. 24 |
| Total | 10, 193. 76 |

The above sum of $1,899.24 which the petitioner received in 1965 represented Jack's share from the sale of the personal property of Victoria.

Petitioner claimed a nonbusiness bad debt of $100,000 in 1959. This represented the amount which Jack owed her under Article III, paragraph D, of the property settlement agreement and which the petitioner alleges became worthless in the year 1959 because of the foreclosure sale of Jack's real property interest in Vernalis and Victoria. This claimed loss was reflected on a schedule attached to petitioner's amended return for 1960 which resulted in a capital loss carryover of $99,000 for 1960. The petitioner claimed a short-term capital loss for that year in the amount of $27,873.36. The balance of the short-term capital loss carryover in the amount of $71,126.64 was claimed as a deduction in 1961. The respondent disallowed these claimed deductions.

Petitioner and Jack filed a joint Federal income tax return for the year 1951. In all subsequent years they filed separate Federal income tax returns.

On or about May 1959, the district director of internal revenue at Los Angeles, Calif., made an additional joint income tax assessment of $46,533.66 against petitioner and Jack for the taxable year 1951. On the same date the district director filed a notice of tax lien in such amount against their interests in Vernalis and Victoria.

In order to consummate the sale of Vernalis in 1961 the petitioner was required to and paid the entire assessment of $46,533.66. Petitioner claimed one half of such payment or $23,266.83, as a nonbusiness bad debt due from Jack which she deducted as a short-term capital loss on her 1961 income tax return. Respondent disallowed the deduction.

### OPINION

As to the first issue, the petitioner contends that she incurred a $100,000 nonbusiness bad debt in 1959 which entitled her to a capital loss carryover in the years 1960 and 1961. She maintains that she entered into a bona fide agreement with Jack whereby he would, as consideration for the conveyance to him of interests in Vernalis and Victoria, reimburse her for one half of the cash payments made from her separate estate to acquire interests in such properties. She argues that the language of the property settlement agreement clearly supports this contention. She further maintains that Jack's obligation to make payments for those interests became wholly worthless in the year 1959.

Respondent, on the other hand, takes the position that no debtor-creditor relationship resulted from petitioner's transfer to Jack of undivided interests in Vernalis and Victoria. To support his contention the respondent stresses that Jack executed no note or other instrument evidencing an agreement with petitioner, that there was no interest or fixed date of repayment with respect to the alleged loans, and that no payments to or demands by petitioner were made through the time she and Jack separated. He further contends that, even if a debt existed, it did not become worthless in 1959 since the petitioner received, subsequent to that date, over $10,000 in partial satisfaction of such alleged debt and the judgment thereon under the writs of execution.

To be entitled to a deduction for a nonbusiness bad debt under the provisions of the Internal Revenue Code of 1954,[1] a taxpayer must show that he was party to a bona fide debtor-creditor relationship.[2]

---

[1] All subsequent references herein are to the Internal Revenue Code of 1954.

[2] Sec. 1.166–1(c), Income Tax Regs., provides as follows:

(c) *Bona fide debt required.* Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166. The fact that a bad debt is not due at the time of deduction shall not of itself prevent its allowance under section 166.

The interlocutory judgment of divorce, issued to petitioner by the Superior Court of the State of California on May 27, 1958, incorporated all the terms of the property settlement agreement entered into by petitioner and Jack 6 days earlier. This agreement, in Article I, paragraph B, stated in part:

The parties do further confirm and acknowledge hereby that at the time of the acquisition of each of said farm properties [Vernalis and Victoria] the interests were acquired by or transferred to the Husband pursuant to an agreement that he would pay to the Wife his proportionate share of the original cost of said properties, no part of which has been paid to date. * * *

When Article I became null and void because Jack was unable to consummate a transaction for refinancing, Article III became operative. Article III, paragraph D, provided in part:

The Husband hereby agrees to pay to the Wife, in full settlement and discharge of the claim she may have or assert against the Husband by reason of the acquisition of his interests in said farm properties and in full settlement and discharge of all other marital or property rights that she may claim against the Husband, the total sum of $100,000 * * *

Petitioner claims that since the deeds to Vernalis which Jack received from her carried U. S. revenue stamps, the conveyance was based on a valuable and substantial consideration, thereby negating any suggestion of a gift. She then contends that the above language from the property settlement agreement incorporated in the decree of divorce confirms the debtor-creditor relationship between herself and Jack, indeed even created an enforceable judgment under California law. It is significant, however, that the petitioner has produced no agreement, as of the time the conveyances to Jack were made, which reflects such alleged debtor-creditor relationship. All she has presented as evidence is her own self-serving statements of such indebtedness plus a separation agreement written over 6 years later. We do not regard this as sufficient to carry her burden of proof. See *Armand P. Bartos*, 27 T.C. 1002 (1957). This is particularly true since intrafamily transactions of this nature are subject to close scrutiny, the presumption being that the transfer between related parties is a gift. See *William Francis Mercil*, 24 T.C. 1150 (1955); *Evans Clark*, 18 T.C. 780 (1952); *Estate of Carr V. Van Anda*, 12 T.C. 1158 (1949), affirmed per curiam 192 F. 2d 391 (C.A. 2, 1951); and *Jacob Grossman*, 9 B.T.A. 643 (1927).

When the petitioner advanced her separate property to acquire Victoria and Vernalis, she had been married to Jack for over 20 years and they had three children. When Jack obtained the interests in both properties, he did not sign a note or any other written instrument evidencing an indebtedness. There was never any mention of a debt or treatment of the husband as a debtor until after the marital difficulties arose.

Petitioner stated at the trial that she expected payment from Jack out of his share of the ranch income. However, the petitioner acknowledged that she never, prior to their separation in 1955, asked Jack for any payments because she was afraid of his violent temper when financial matters were mentioned. This implies that, if the parties had not encountered marital difficulties, either Jack's disposition would have had to change or the petitioner would have never asked him for repayment of his alleged debt. Moreover, while asserting that such a debt existed, the petitioner admitted that the time and method of repayment were never discussed. Likewise, while petitioner says she expected repayment from Jack's share of the ranch income, such expectation was highly unlikely since Jack immediately depleted almost one half of his $100,000 equity in Victoria through a transfer of his interest to a trust with his children and father-in-law as beneficiaries. This combination of factors demonstrates to our satisfaction that the petitioner did not have a "valid and enforceable obligation" owed to her by Jack. Neither her own declarations nor the provisions of the property settlement agreement entered into several years later overcome the presumption that she made a gift to Jack of interests in Vernalis and Victoria. Cf. *Armand P. Bartos, supra; Evans Clark, supra;* and *William Francis Mercil, supra.*

Having concluded that no debtor-creditor relationship existed between the petitioner and Jack, we hold that she is not entitled to a nonbusiness bad debt deduction stemming from transfers of interests in Vernalis and Victoria to him. Furthermore, even if we assume that a debt existed, we agree with the respondent that it did not become totally worthless in 1959.[3] When Jack's real property interests were foreclosed in 1959, he still owned personal property interests. Pursuant to the writs of execution obtained by the petitioner on the judgment she obtained in 1958, she recovered $10,193.76 between 1961 and 1965 on the sale of such interests in personalty.

We turn now to the second issue. Petitioner and Jack filed a joint Federal income tax return for the year 1951. An additional assessment for that year in the amount of $46,533.66 was made against them in 1959 and the district director of internal revenue filed a notice of lien against their interests in Vernalis and Victoria in that amount. In 1961 the petitioner, in order to consummate the sale of Vernalis, paid the entire additional assessment without any contribution from Jack.

Petitioner claims that she is entitled to a nonbusiness bad debt deduction in the amount of $23,266.83, this representing Jack's "share" of the additional tax obligation on their 1951 joint Federal income tax

---

[3] Sec. 1.166–5(a)(2), Income Tax Regs., provides that "A loss on a nonbusiness debt shall be treated as sustained only if and when the debt has become totally worthless, and no deduction shall be allowed for a nonbusiness debt which is recoverable in part during the taxable year."

return. Petitioner contends that she had both a statutory and a contractual right to compel Jack's contribution in that amount. She further contends that such debt was uncollectible in 1961 because Jack had permanently left the United States and his interests in Vernalis and Victoria had previously been foreclosed.

Article XIII of the property settlement agreement expressly obligated Jack to pay his share of any additional assessments made with respect to the 1951 joint Federal income tax return. Under California Civil Code section 1432,[4] petitioner also had a statutory right of contribution from Jack for his proportionate share of any assessment as joint obligor on that return. See also *Murchison* v. *Murchison*, 219 Cal. App.2d 600 (1963). Thus it is clear that petitioner had both a contractual and a statutory claim against Jack in the amount of $23,266.83, which is one half of the outstanding tax obligation with respect to their 1951 income taxes. However, this right of contribution does not compel the conclusion that the petitioner, upon a showing of its worthlessness, is entitled to a nonbusiness bad debt deduction for Federal income tax purposes.

Under section 6013(d)(3)[5] the petitioner was jointly and severally liable for the additional assessment made with respect to her 1951 joint income tax return. Respondent was therefore correct in proceeding against and collecting the entire outstanding tax liability for that year from her. Cf. *Marie A. Dolan*, 44 T.C. 420 (1965).

Section 164 of the Code provides for the deductibility of taxes, and section 164(b)(1) specifically prohibits any deduction for Federal income taxes. Thus the petitioner could not deduct the $46,533.66 which she paid in 1961 on the additional taxes assessed on the 1951 joint income tax return. Nevertheless, it is her contention that she was entitled to deduct one half of that amount in 1961 as a nonbusiness bad debt under section 166(d) because her right of contribution against Jack became worthless when the payment was made. Such a deduction must not be allowed, for "Can the Ethiopian change his skin, or the leopard his spots?"[6]

---

[4] Sec. 1432. Contribution among joint obligors.

CONTRIBUTION BETWEEN JOINT PARTIES. A party to a joint, or joint and several obligation, who satisfies more than his share of the claim against all, may require a proportionate contribution from all the parties joined with him.

[5] SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

(a) JOINT RETURNS.—A husband and wife may make a single return jointly of income taxes under subtitle A, even though one of the spouses has neither gross income nor deductions, * * *

\*       \*       \*       \*       \*       \*       \*

(d) DEFINITIONS.—For purposes of this section—

\*       \*       \*       \*       \*       \*       \*

(3) if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several.

[6] Jeremiah 13:23.

A husband and wife have the option of filing a joint return. In return for this privilege section 6013 imposes joint and several liability on them. As a result, the petitioner had an absolute liability for the entire additional assessment made with respect to 1951 income taxes. We see no reason to permit her to avoid this obligation of several liability by claiming the worthlessness of a contractual and statutory right of contribution from Jack as a joint obligor. Petitioner had an obligation to pay the entire $46,533.66 owed in Federal income taxes and respondent had an absolute right to collect such amount entirely from the petitioner. Having elected to file a joint return, the petitioner must accept all consequences of the election, viz, the duty to pay the full amount of the tax due. In our judgment she is not entitled to a deduction which would, either directly or indirectly, reduce the $46,533.66 in taxes which she clearly owes.

Petitioner cannot invoke section 166(d) to circumvent the prohibition of a deduction under section 164(b)(1). In *Edwin J. Schoettle Co.*, 3 T.C. 712 (1944), affirmed per curiam 147 F. 2d 549 (C.A. 3, 1945), the taxpayer filed a bond with the collector of internal revenue in the amount of the assessment so that its claim for abatement would be considered. Upon its subsequent loss of the action with regard to the assessment, the taxpayer claimed a deduction in the amount of the bond as a "loss on adverse judgment," arguing that the payment was made on its contractual obligation under the bond rather than on its tax liability. We denied the deduction and held that the payments were for Federal taxes due and that it was of no consequence that the taxes were paid pursuant to the terms of a contract between the taxpayer and the Government rather than through normal collection procedures. In that case we looked behind the contract to the underlying obligation. The same rationale is applicable here. The deductibility of the alleged nonbusiness bad debt must be treated in a manner consistent with the proper treatment of the underlying obligation, i.e., the Federal tax liability. See also *Edward Katzinger Co.* v. *Commissioner*, 129 F. 2d 74 (C.A. 7, 1942); and *Darwin O. Nichols*, 29 T.C. 1140 (1958). Since the petitioner was not entitled under any circumstances to a deduction for the Federal income taxes she paid, we think she cannot deduct part of them merely because her husband could not pay his share.

To reflect the concessions made by the parties and our conclusions on the disputed issues,

*Decision will be entered under Rule 50.*