Shirley S. Imeson v. Commissioner.
Imeson v. Commissioner
Docket No. 5474-67.
United States Tax Court
T.C. Memo 1969-180; 1969 Tax Ct. Memo LEXIS 115; 28 T.C.M. (CCH) 899; T.C.M. (RIA) 69180; September 3, 1969, Filed Shirley S. Imeson, pro se, P.O. Box 483, Olympia, Wash. W. John Howard, Jr., for the *116 respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in petitioner's Federal income taxes for the years 1964 and 1965 in the respective amounts of $118.95 and $111.73; however, petitioner is now claiming additional deductions for "capital losses" of $2,800 and $2,300 for those respective years which deductions were claimed for the first time on timely-filed claim for refund forms No. 843. [1]
Concessions have been made by both parties leaving the following issues for decision: (1) Whether petitioner is entitled to either capital loss deductions as the result of her broken marriage or to bad debt deductions because of alleged unpaid child support; (2) Whether petitioner is entitled to deduct the expense of a private investigation ordered by her; (3) Whether petitioner claimed excessive depreciation for two automobiles *117 used partially in her business; and (4) The amount of her allowable casualty loss resulting from vandalism to petitioner's two cars. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and stipulated exhibits are incorporated herein by this reference. Petitioner is an individual whose residence at the time she filed her petition herein was Olympia, Washington. Her tax returns for the years in issue were filed with the district director of internal revenue at Takoma, Washington. Petitioner was carried to George H. Imeson from 1936 until they were divorced on July 16, 1954. The following children were born to this marriage on the dates indicated: Neal Lawrence Imeson, November 1940; Linda Barbara Imeson, February 1943; and Keith Lee Imeson, September 1947. Under the divorce decree petitioner was granted the care and custody of the children with certain visitation rights being reserved to her former husband. Thereafter petitioner received some funds for child support from her former husband, some of which were paid to her during the years in issue but none were paid after April of 1965. In addition the decree of divorce confirmed a Property *118 Agreement which petitioner and George H. Imeson had entered into in October 1953 (and supplemented just prior to the divorce) under which petitioner received, inter alia, the equity in their home at Takoma, Washington, together with household goods and furniture, one automobile and equities in 14 real estate contracts most or all of which parcels of land were located in or near Takoma, 900 Washington. These 14 equities had a total value of just over $24,000. George H. Imeson received the remainder of the community assets as his separate property. After the divorce it was necessary for petitioner to care for her real estate equities, collect rents, arrange for repairs and otherwise service them. The record is unclear as to how many equities or properties she owned during the years in issue but during such years she owned and operated a 1958 Chevrolet and a 1960 MG, for which she had paid $2,500 and $1,000, respectively. On her returns she deducted one-third of her claimed operating expenses in connection with these cars as a business expense and apparently still contends for this percentage of the use of the cars as business connected. Respondent does not contest such business *119 use percentage. During 1965 vandals smashed the windshield of the 1958 Chevrolet while it was in a parking lot. Also in 1965 vandals slit the convertible top of the 1960 MG. Petitioner's insurance did not cover either occurrence. Necessary repairs to both cars cost $146.22, which amount petitioner deducted as a business expense on her 1965 return. The record does not disclose how the cost of $146.22 was allocated between the two cars. For some period of time of unknown duration during and prior to the years in issue, petitioner held several secretarial jobs. She felt that some person or group had organized and was promoting a campaign of harassment against her. The record is not clear as to many details but petitioner's testimony is that the campaign seemed designed to keep her undignified and "off balance." One detail was that two or three fellow employees would start to whistle as soon as anyone started talking to petitioner. No such harassment ever occurred during her activities in management of her real estate equities. In 1964 petitioner hired a private investigator "to really investigate and get something on this man and put a stop to it. But, of course, he didn't, he *120 treated it as a joke." The record is unclear as to whether the alleged harassment ceased following the investigation. Petitioner paid the private investigator's bill in the amount of $194.87 during 1964. She also paid an attorney $150 for recommending the private investigator to her and paid a $25 taxicab bill in order to attend a nighttime conference with the investigator. On her return for 1965 petitioner claimed a total of $398 in connection with this private investigation. Opinion Issue 1 We find it difficult to articulate petitioner's principal contention, which she has chosen to call a "capital loss" deduction. The exact language employed on her 843 claims for refund is: Added Deduction: $2,800 capital loss (pro rated) from my share community prop. Broken Contract - 1954 (Marriage contract initiated 1936.) Three contractual responsibilities (children) "retired" at less than minimum standards under which they were initiated. Petitioner computes the amount of the claimed deductions as follows: If I had left $20,000 of my $24,000 community property alone at its 6 per cent interest rate, leaving the interest after taxes added to the capital each year, by December *121 of '65, I would have had more or less $30,000. Child support, the minimal court ordered amount only was as follows: For Mr. Imeson to pay, July 1954 to May 1965, $6,300. May 1956 to December 1958, $7,200. At that time the oldest child became 18 years of age of the three children. From January 1959 to November 1963, $7,140. January '64 to August 1965, $1,200. That was a total of $21,840 which should have been paid which was court ordered. Of that amount, $9,500 or less actually was paid from July 1954 to April 1955 [1965], and that left $12,340 which was the amount of court ordered child support which was not paid. Then I added the $30,000 which I would have added of my capital plus interest to the $12,340 child support which had not been paid which amounts to $42,340 of capital loss resulting from the broken business marriage contract. Petitioner then states she is requesting total deductions of only $30,000 out of the $42,340 figure and allocates $2,800 to 1954, the year of divorce (since that was the year of her heaviest expenses on the children), $2,300 to 1955 and $2,000 to each year thereafter through 1967, with $900 being allocated to 1968. She seeks to use these deductions *122 10 years later in each case so 901 that they will commence in 1964 and terminate with the $900 deduction in 1978. On brief petitioner has stated her theory as follows: The broken marriage (business) contract is a financial transaction with real estate, personal property, mortgages, children, contracts, to be treated on an equal basis, with the remaining partner not being penalized by the government if she PAYS THE DEBTS OF THE ABANDONING PARTNER. She should not be penalized, but she presently is. THE CAUSES FOR DIVORCE HAVE NO BEARING ON THE COST OF RAISING CHILDREN, AND FOR SOCIETY TO PENALIZE THE WOMAN AND CHILDREN FINANCIALLY BY TAXING UNDULY THE WOMAN'S CAPITAL USED AT A MINIMUM RATE TO RAISE CHILDREN, IS DISCRIMINATORY AND, THE PETITIONER RESPECTFULLY SUBMITS. AN UNFAIR STIGMA DIRECTED AT SUCH WOMEN AND CHILDREN. TO NOT ALLOW UNPAID CHILD SUPPORT AS A BAD DEBT IS A STIGMA AGAINST HELPLESS CHILDREN. We interpret petitioner's argument as being twofold: that she be allowed bad debt deductions because her ex-husband failed to make all of the child-support payments ordered by the divorcing court and/or that she be allowed capital loss deductions for having supported the children *123 out of her separate property. Petitioner, of course, has neither proved the amounts of her claimed deductions or even attempted to justify her method of backdating her yearly claims by 10 years. Even assuming that petitioner had overcome these difficulties, her position would be no better. We have recently decided a case in which the taxpayer made almost identical contentions as are made in the instant case. We there said, Dale A. Swenson, 43 T.C. 897 (March 1965), at 898-899: It is well established that the deduction of a bad debt from gross income under the income tax provisions of the internal revenue statutes is limited to debts created by advances out of capital or out of income previously taxed or exempted or, in other words, debts with regard to which the taxpayer has a basis. See 5 Mertens, Law of Federal Income Taxation, sec. 30.12, p. 30; sec. 166(b), I.R.C. 1954. Acting on this principle, we held in Pearl A. Long, 35 B.T.A. 479, affd. 96 F. 2d 270, certiorari denied 305 U.S. 616, that uncollectible arrearages in payments ordered by a divorce court for the maintenance of taxpayer's divorced *124 wife and of their children did not constitute a bad debt deductible from the wife's gross income. In apparent recognition of this principle, petitioners advance the argument that "The funds used to create the debt" consisted of the expenditures made by them out of their income in excess of the amounts of child support payments received by them from Waldram and that their basis under section 1011 of the Internal Revenue Code of 1954 is the cost to them of the debt which "in this instance is the total amount expended for child support by M. Veone Swenson, but not in excess of $1200.00 per year." In our opinion this argument is without merit. Waldram's obligation to make the payments here involved was imposed on him by law, arose from his status as a father, and was defined by the divorce court; it was in no way contingent on any payments for support of the children made by petitioner. Therefore it cannot be said that such payments by petitioner were made for the acquisition of any right of action against Waldram. We are unable to see how petitioners could have any cost or other basis with regard to the arrearages in such payments, or to see how any funds of *125 theirs can be said to have created the debt here in question or to have constituted its cost. We have re-examined Swenson, feel that our conclusions there reached are correct and that they control this issue which we therefore decide for respondent. See also Elizabeth N. Rude, 48 T.C. 165 (May, 1967); Thomas v. Commissioner, 100 F. 2d 408, 411 (C.A. 2, 1938), affirming a Memorandum Opinion of this Court; and W. Thomas Menefee, 8 T.C. 309 (Feb. 1947). Issue 2 On her return for 1964 petitioner deducted $398 as her total cost for a private investigator and other expenses in connection with "job harassment." She admits that none of the claimed harassment had any connection with her activities in servicing her real estate interests and we therefore consider her claim as being made in connection with her secretarial employment. 902 Respondent has determined that the claimed expenditures [2] were made in connection with personal living or family matters and were therefore nondeductible. We agree. *126 Petitioner argues that the investigative costs were necessary to maintain her dignity and status as a self-supporting and childsupporting person and were therefore connected with her ability to earn a living, but the record does not disclose any real connection with her secretarial employments nor does petitioner contend that the claimed harassment ever kept her from getting or keeping a job or kept her from getting a promotion. At one point in her testimony petitioner stated that the investigation was connected with her salaried employments "in as far as it kept me off balance and defensive and unhappy, but it was also part of my social life." We conclude that the investigation was entirely in connection with her social life and decide this issue for respondent. Issue 3 On her return for 1965 petitioner deducted one-third of the insurance, basic maintenance and repairs on her two cars as being business connected. Respondent did not disturb this item. She also deducted one-third of the "replacement" cost of one of the cars in the amount of $500 which item was reduced to $166.50 by respondent's determination. Petitioner's position seems to be that her real estate activities *127 would have justified the purchase of a new car each year resulting in extremely large depreciation deductions on her returns; that she chose instead to drive her cars for many years with resultant low depreciation deductions and entitling her to claim all of the replacement costs on the rare occasions when replacement was necessary. Respondent's determination does not disturb petitioner's claimed one-third business use of the two automobiles and, in round figures, it allows depreciation on a seven-year life computed on petitioner's total cost of $3,500. This determination is reasonable and it is sustained. Issue 4 On her 1965 return petitioner deducted as a business expense the entire cost of certain repairs to both of her cars. The repairs in question were made necessary as a result of acts of vandalism. Respondent allowed one-third of this expense in the amount of $49.02 as being business connected. Respondent recognizes that the disallowed portion of the expense in the amount of $97.20 is of the character of an allowable casualty loss under section 165 [3] but contends that it was not business connected and was therefore subject to the $100 limitation of section 165(c)(3). *128 See section 1.165-7 (b)(4)(iv), Income Tax Regs., which provides in pertinent part: If a loss is sustained in respect of property used partially for business and partially for nonbusiness purposes, the $100 limitation applies only to that portion of the loss properly attributable to the nonbusiness use. * * * Petitioner's position seems to be either that the cars were being used on business errands when the vandalism occurred or that they were not usable at all (and therefore not usuable in the real estate business) until the damages had been repaired. We find neither position tenable and support respondent's determination. Decision will be entered under Rule 50. 903 Footnotes
1. In her petition petitioner refers to the amounts of these claims as being $2,500 and $2,000, respectively, however, the 843 forms and petitioner's brief both make claims for $2,800 and $2,300 for the respective years and the claims are considered to be for the larger amounts.↩
2. The record indicates that petitioner's total expenses as to this issue were $369.87 rather than the $398 which was claimed. At least part of the unexplained difference of $28.13 is represented by a $10 speeding ticket which petitioner got "as a result of my displeasure with the activities of the private investigator in Takoma, after I left him one day."↩
3. All references are to the Internal Revenue Code of 1954.↩