CAROLYN C. MARLETT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marlett v. Commissioner
Docket No. 8950-74.
United States Tax Court
T.C. Memo 1976-105; 1976 Tax Ct. Memo LEXIS 297; 35 T.C.M. (CCH) 456; T.C.M. (RIA) 760105; April 5, 1976, Filed William L. Peck, for the petitioner. Elsie Hall, for the respondent. TANNENWALD
TANNENWALD, Judge: Respondent determined a deficiency in petitioner's Federal income tax for 1972 in the amount of $2,299.24. At issue are a bad debt deduction and medical expense deduction for that year. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, a resident of Indianapolis, Indiana, at the time of filing the petition herein, filed a timely income tax return for the 1972 taxable year with the Internal Revenue Service Center at Memphis, Tennessee. In 1966, petitioner married Charles *298 H. Marlett. For the years 1969 through 1971, she and her husband filed joint tax returns. During this period Carolyn was employed as a speech therapist and teacher and Charles was employed as a sales manager for the Huddle System of the Haag Drug Company. For each of these years, the Marletts received a refund in respect of Federal income taxes in the following amounts: [1] Year
Amount
Date of refund
1969
$ 6,187.52
May 1, 1970
1970
4,693.28
Mar. 19, 1971
1971
1,304.13
Mar. 20, 1972
Total $12,184.93 Each refund check was payable to Charles W. [sic] and Carolyn C. Marlett and required the endorsement of each spouse. Upon receipt of each check, Charles requested Carolyn's endorsement so that he could cash the check. Carolyn complied each time, although it was always her understanding that she was entitled to one-half of the proceeds of each check. Charles cashed each check but never gave Carolyn any of the proceeds. Upon receipt of the third check, Carolyn asked for Charles' endorsement so that she might negotiate the check and get her share thereof; Charles, however, refused. Carolyn endorsed the third check, as she had the first two, for Charles *299 to cash. On several occasions during his marriage to petitioner, Charles hosted parties in honor of the Indiana University football team. Although Carolyn thought the cost, or at least one-half the cost, of these parties was to be borne by Charles, Carolyn covered all of the expenses and was never reimbursed by Charles. [2]
In January 1972, Charles asked Carolyn for some money so he could meet his obligations coming due; Charles told Carolyn that his Christmas bonus was forthcoming and that he would repay her when he received the same. Carolyn drew a check payable to Charles in the amount of $600, which Charles cashed. Charles never repaid petitioner for this amount. Petitioner asked Charles to repay her the amounts she deemed to be due her at various times, but *300 repayment was never made. In the spring of 1972, the couple separated. In the fall of 1972, petitioner and her attorney met with Charles and threatened to sue him if he didn't repay petitioner the amounts due her. Charles told the attorney to go ahead and do so, but, in that event, he would "take bankruptcy" so that Carolyn would have to stand in line with his numerous other creditors. Believing this to be the case, [3] Carolyn, on the advice of her attorney, refrained from bringing suit. At the time of this exchange, Charles was still employed with the Huddle System. He subsequently changed jobs and, at the time of trial, he was employed by Sports Imports, Inc.
In 1973, Carolyn and Charles were divorced; Carolyn was not awarded any alimony. Charles also told the divorce court that if he had to pay Carolyn any money, he would "take bankruptcy." None of the amounts which Carolyn claims Charles owed her was evidenced by a written instrument; no date was fixed *301 by which Charles was to make any payment; and no interest rate was fixed. [4]
On her Federal income tax return for 1972, Carolyn deducted $7,600 as a bad debt becoming wholly worthless during the 1972 taxable year. This total was composed of the following: Approximately one-half of the
joint income tax refund
checks for 1969-1971
$6,000.00
Check dated Jan. 16, 1972
600.00
Incidental advances (money
spent for football parties)
1,000.00
Total claimed deduction
$7,600.00 Since the filing of her petition, Carolyn has adjusted her claimed deduction as follows: Precisely one-half of the
joint income tax refund
checks for 1969-1971
$6,092.46
Check dated Jan. 16, 1972
600.00
Incidental advances (one-
half the cost of football
parties that Charles
said was rightfully his
expense)
500.00
Total claimed deduction
$7,192.46
Petitioner also claimed deductible medical expenses for 1972 in the amount of $480.66, which respondent disallowed. Petitioner has adjusted her claimed deduction as follows: To
Amount
Dr. Schuster
$450.00
Dr. Hull
162.00
Associated Anesthesi-
ologists
126.00
Dr. Pierce
51.00
$789.00
Less: 3 per cent
of adjusted
gross income
(.03 X $15,978.02)
(479.34)
$309.66
*302 Petitioner incurred and paid all of the claimed expenses and, except for part of the $450 paid to Dr. Schuster, was not compensated by insurance therefore or otherwise. Charles' employer provided medical insurance for Charles and Carolyn. Carolyn directed the receipt for Dr. Schuster's bill to Charles, who filed a claim for reimbursement of the $450 which Carolyn had paid entirely from her own funds. Upon later inquiry to the insurance company, Carolyn learned that Charles received $180 in respect of this claim. Charles never gave any of these medical insurance proceeds to Carolyn. OPINION The allowance of a bad debt deduction depends upon the existence of a bona fide debt which became worthless in the year for which the deduction is claimed. Section 166. [5] The establishment of a valid debt subsumes a real expectation of repayment on the part of the creditor as a result of the transaction. See Elizabeth N. Rude,48 T.C. 165, 172-173 (1967). Petitioner claims that advances to Charles *303 in the form of her endorsements of joint tax refund checks, her issuance of the $600 check, and her assumption of Charles' share of the cost of the football parties constituted valid loans which became worthless in 1972. Further, petitioner claims such debts were business bad debts entitling her to an ordinary loss rather than nonbusiness bad debts which are treated as capital losses. Petitioner characterizes her marriage as a relationship maintained for financial convenience only, hence, a "business" relationship from which business debts arose. Respondent takes the position that no debts were created; or if they were, they did not become worthless in 1972; or if there were worthless debts in 1972, they were nonbusiness bad debts. [6]
In addition *304 to the general rule that the petitioner bears the burden of proof, Rule 142, Tax Court Rules of Practice and Procedure, the petitioner in the instant case is faced with the presumption that interspousal transfers do not constitute bona fide loans. This presumption is overcome only by clear and convincing evidence that would leave no reasonable doubt as to the parties' intentions in executing the transfers. Elizabeth N. Rude,supra,48 T.C. at 172; Armand P. Bartos,27 T.C. 1002, 1005 (1957); Evans Clark,18 T.C. 780, 783 (1952), affd. per curiam 205 F. 2d 353 (2d Cir. 1953); Estate of Carr V. Van Anda,12 T.C. 1158, 1162 (1949), affd. per curiam 192 F. 2d 391 (2d Cir. 1951); cf. William Francis Mercil,24 T.C. 1150, 1153 (1955). However much we may sympathize with petitioner, her remedy, if any, does not lie in the bad debt provisions of the Internal Revenue Code. Petitioner has failed to establish that her endorsements of the joint checks, her financing of football parties or her $600 payment to Charles were intended to create a bona fide debtor-creditor relationship. At *305 the time of each "advance" to Charles, Carolyn never set repayment dates or interest rates, nor did she demand any written evidence of indebtedness. At the time of each "advance," she knew of her husband's proclivity to invest in unsuccessful business ventures. [7] Thus, we fail to see how petitioner advanced funds with a genuine expectation of repayment. Petitioner herself seems to have trouble characterizing the transactions. At various points in her brief, she refers to them as express loans and at other points she refers to them as "involuntary" loans. At times, she speaks of her attempts to "preserve her marriage" in respect of these transfers and, at other times, she suggests that her husband wrongfully converted her property when he retained all of the proceeds of the refund checks. As the marriage began to deteriorate, it is apparent that she tried to view these past advances as debts owing to her. But these belated characterizations will not save the day. See Elizabeth N. Rude,supra.Since petitioner's testimony is the only evidence before us concerning "indebtedness," her own contradictory labels make her requested *306 finding impossible. [8]
In short, even if we were to disregard the presumption applicable to intrafamily transfers (see p. 8, supra), we think petitioner has not carried her burden of proving that a bona fide debtor-creditor relationship existed between her husband and herself during the taxable year. [9] The mere fact that Carolyn may have thought that Charles would reimburse her for her claimed share of the amounts involved herein does not require us to conclude that an indebtedness existed within the meaning of section 166. *307 Turning to petitioner's 1972 medical expense deduction, we must now decide whether petitioner should be deemed to have been compensated by insurance, in whole or in part, for her $450 payment to Dr. Schuster. We have found as a fact that a medical insurance payment of $180 was made to Charles in respect of this expense and that Charles did not remit any insurance proceeds to Carolyn. Neither the policy providing medical coverage nor the pertinent provisions thereof have been introduced as evidence herein. By the fact of the insurance payment for part of Dr. Schuster's bill, we know that Carolyn as well as Charles was covered by the insurance policy. From her testimony, we gather that Carolyn often referred reimbursable medical bills to Charles so that he would file insurance claims. There is no evidence to suggest that Carolyn could not have dealt directly with the insurer. Her practice of allowing Charles to claim and collect insurance proceeds, therefore, must be deemed a matter of personal convenience for Carolyn. In effect, Charles must be deemed to have acted under the express agency of Carolyn. We conclude that reimbursement made to Carolyn's agent sufficed as reimbursement *308 to Carolyn. Cf. 2 Mertens Law of Federal Income Taxation, sec. 10.07 (Malone rev. 1974). Carolyn has not shown that she required or demanded that Charles turn over such insurance proceeds. [10]
Thus, we think it is clear that there has been insurance compensation for the $450 expense to the extent of $180. Cf. Marvin Wiener,T.C. Memo. 1971-56. Petitioner's vehicle for mitigation of her expenses is not the medical expense deduction. Cf. Norris Bloomfield,52 T.C. 745, 752 (1969); Elizabeth N. Rude,supra,48 T.C. at 174. Accordingly, petitioner's claimed medical expense deduction should be reduced through a reduction *309 of the amount paid to Dr. Schuster from $450 to $270. Decision will be entered under Rule 155.
Footnotes
1. In addition to his employment with the Huddle System, Charles was involved in various business investments. His activities in this regard resulted in tax deductible losses which account for overpayment of tax through withholding from the Marletts' salaries in 1969, 1970, and 1971.↩
2. The only evidence as to the cost of such parties was Carolyn's unsubstantiated testimony that such cost amounted to $1,000.↩
3. Carolyn knew Charles had signed bank notes for $100,000. There is no evidence on the record to indicate when she became aware of this obligation or if she knew of it at the time she gave him the above-mentioned sums.↩
4. There is no evidence to indicate that Carolyn ever gave or attempted to give a restrictive endorsement on the joint refund checks.↩
5. All section references are to the Internal Revenue Code of 1954, as amended.↩
6. Respondent does not challenge petitioner's allegation that she was entitled to one-half of the refund proceeds. Rather, he relies on the argument that her endorsements of the checks did not constitute bona fide loans. By the same token, petitioner makes no claim that Charles' failure to pay her constituted a theft loss under section 165.↩
7. See footnote 1, supra.↩
8. In any event, there is no probative evidence that the "advances" were sufficiently acknowledged by Charles as his indebtedness so that it might be concluded that a debt within the meaning of section 166 was created at any time prior to the close of the taxable year involved herein. See Elizabeth N. Rude,48 T.C. 165, 173↩ (1967).
9. We also note that, even if we were to have found that bona fide debts existed, the deduction would nevertheless be denied for failure of proof that all or any part of the cumulative "debt" became worthless in 1972. Additionally, there is clearly insufficient proof in the record to justify a conclusion that if a bad debt were found it would constitute a business bad debt within the meaning of section 166↩.
10. We note from petitioner's testimony that, at one point prior to the 1973 divorce, petitioner considered the $180 insurance payment to be a debt of her husband to her. She does not, however, seek to classify this as a bad debt for purposes of a tax deduction in the instant proceeding. In any event, the record herein does not support the characterization of this transaction as a "loan." Neither has there been any attempt to prove that the transaction gave rise to a theft loss under section 165. Cf. footnote 6, supra.↩