T.C. Memo. 1999-40

UNITED STATES TAX COURT

MYER B. BARR AND ESTATE OF DIANA L. BARR, DECEASED, WILLIAM M.
MARCUS, RONNIE S. TRAYNOR AND MARIE L. COTTON, PERSONAL
REPRESENTATIVES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17491-97.                    Filed February 8, 1999.

Donald F. Mintmire, for petitioners.

Alison W. Lehr, for respondent.

MEMORANDUM OPINION

PARR, Judge:  Respondent determined a deficiency in
petitioners' Federal income tax for the taxable year 1993 in the
amount of $30,720.

All section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. References to petitioner are to Myer B. Barr.

The issues for decision are: (1) Whether for 1993 petitioners are entitled to a $100,000 nonbusiness bad debt deduction related to a transaction with Super City Meats, Inc. (Super City Meats). We hold they are. (2) Whether for 1993 petitioners are entitled to charitable contribution deductions in excess of the amount allowed by respondent. We hold they are to the extent set forth below.

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated herein by this reference. At the time the petition in this case was filed, petitioner resided in Palm Beach, Florida.

For convenience, we combine our findings of fact with our opinion under each separate issue heading.[1]

Issue 1. Bad Debt

Respondent determined that for 1993 petitioners were not entitled to a $100,000 nonbusiness bad debt deduction related to a transaction with Super City Meats.

---

[1] We have considered each of the parties' arguments and, to the extent that they are not discussed herein, find them to be unconvincing.

- 3 -

Section 166 entitles a taxpayer to a deduction for a bad debt that becomes worthless during the taxable year. A business bad debt can be deducted from ordinary income if it is either partially or totally worthless. Sec. 166(a). A nonbusiness bad debt, however, is treated as a short-term capital loss. Sec. 166(d). Petitioners bear the burden of proving that a bona fide debt exists and that the debt became worthless during the taxable year in issue. Rule 142(a).

Petitioner has two sons, Jeffrey Barr (Jeffrey) and Stephen Barr (Stephen). Petitioner has a close relationship with Jeffrey; however, he is estranged from Stephen for personal reasons and maintains no contact with him.

Super City Meats, of which Stephen was president and 50 percent co-owner, sold products to various Chinese restaurants. On September 13, 1990, Jeffrey advanced Stephen $100,000. The purpose of this advance was to provide working capital for Super City Meats. The advance was to be used to interview and hire a new manager, pay off debts to a former supplier, and make purchases from new suppliers.

A promissory note (the note) in the amount of $100,000 was executed by Stephen personally and as president of Super City Meats to Jeffrey several days after the advance, but it was dated September 13, 1990. Jeffrey required Stephen to sign the note personally as an added assurance of repayment. The note bore interest at 13 percent per annum.

Jeffrey expected that he would be repaid in approximately 18 months. The repayment was to be made from certain insurance proceeds that Super City Meats was to receive. The insurance proceeds were from policies on Stephen's business partner, the executive manager and other 50 percent co-owner of Super City Meats, who had been murdered on the business premises in July of 1990. During that time, Super City Meats was also having problems with sales and collecting receivables due to alleged pressure from the Chinese mafia. When Jeffrey advanced Stephen the $100,000, he was aware that Stephen's business partner had been murdered.

Petitioner is a graduate of the University of Pennsylvania and Harvard Law School. At that time, petitioner was retired and invested in various fields, especially mutual bond funds. On February 28, 1991, petitioner and Jeffrey executed an agreement where Jeffery transferred to petitioner his rights created under the note for $100,000.[2] Petitioner testified that he acquired the note because he considered it a good investment. Petitioner testified that at that time his investments paid between 7 and 9 percent interest, and the original 13 percent interest on the note was an attractive investment. On their 1993 Federal income tax return, petitioners reported taxable interest of $73,672 and tax-exempt interest of $207,628. In addition, petitioners

---

[2]    Petitioners' 1993 Federal income tax return, however, indicates an acquisition date of Sept. 13, 1990.

reported $1,093,778 of capital gains on their 1993 Federal income tax return.

When petitioner purchased the note, he did not consult with any advisers or perform any independent research regarding Super City Meats. Furthermore, when petitioner purchased the note, he had no knowledge of the murder of Stephen's business partner or the alleged problems with the Chinese mafia. Jeffrey continued to manage the note, and Stephen was not informed that petitioner had purchased it.

In February 1992, Stephen was indicted for the July 1990 murder of his business partner. The indictment against Stephen was not dismissed until August of 1993. As a consequence of defending himself against the criminal indictment, Stephen "didn't have a dime." In 1993, Stephen was unemployed, he and his wife were provided living expenses by his mother-in-law, and he carried in excess of $100,000 of credit card debt.

The insurance companies refused to pay on the policies of Stephen's murdered business partner. The insurance proceeds were never paid to Super City Meats or any of its representatives.

On September 30, 1993, Stephen acknowledged in a letter to Jeffrey that he did not have the current ability to repay the advance and the required interest. On October 11, 1993, Stephen further acknowledged in a letter to Jeffrey that it was unlikely he would ever have the resources to repay the debt.

On their 1993 Federal income tax return, petitioners claimed a nonbusiness bad debt deduction of $100,000. The burden of

proof is on petitioners to show that the transaction at issue was a bona fide loan. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). We always examine intrafamily transactions with special scrutiny. Caligiuri v. Commissioner, 549 F.2d 1155, 1157 (8th Cir. 1977), affg. T.C. Memo. 1975-319; Perry v. Commissioner, 92 T.C. 470, 481 (1989), affd. without published opinion 912 F.2d 1466 (5th Cir. 1990); Bragg v. Commissioner, T.C. Memo. 1993-479. The presumption is that a transfer between family members is a gift. Perry v. Commissioner, supra at 481; Estate of Reynolds v. Commissioner, 55 T.C. 172, 201 (1970). This presumption may be rebutted by an affirmative showing that there existed a real expectation of repayment and intent to enforce the collection of the indebtedness. Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). A mere declaration of intent by the taxpayer is insufficient if the transaction fails to exhibit more reliable indicia of debt. See Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306; Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 (5th Cir. 1974).

The determination of whether a transfer was made with a real expectation of repayment and an intention to enforce the debt depends on all the facts and circumstances including whether: (1) There was a promissory note or other evidence of indebtedness; (2) interest was charged; (3) there was a fixed schedule for repayment; (4) security or collateral was requested; (5) a demand for repayment was made; (6) the parties' records, if any, reflect

the transaction as a loan; (7) any repayments have been made; and (8) the borrower was solvent at the time of the loan.  See Hunt v. Commissioner, T.C. Memo. 1989-335; see also Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963); Estate of Maxwell v. Commissioner, 98 T.C. 594, 604 (1992), affd. 3 F.3d 591 (2d Cir. 1993); Estate of Kelley v. Commissioner, 63 T.C. 321, 323-324 (1974); Rude v. Commissioner, 48 T.C. 165, 173 (1967); Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. per curiam 205 F.2d 353 (2d Cir. 1953); Bragg v. Commissioner, supra. The factors are not exclusive, and no one factor controls. Rather, our evaluation of the various factors provides us with an evidentiary basis upon which we make our ultimate factual determination of whether a bona fide indebtedness existed.  See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973).

With those factors in mind, we turn to the facts and circumstances surrounding the transaction to determine whether a bona fide debtor-creditor relationship was created.

### 1.  Promissory Note or Other Evidence of Indebtedness

Petitioners introduced a promissory note to Jeffrey, signed by Stephen, for $100,000.  Petitioners also introduced an agreement between petitioner and Jeffrey whereby petitioner purchased the note for $100,000.

### 2.  Interest

The note executed by Stephen to Jeffrey stated that interest would be paid at the rate of 13 percent per annum on the unpaid principal amount.  At some time after petitioner acquired the

note, Stephen and Jeffrey lowered the interest rate to 10 percent.

Jeffrey testified that from the time the note was executed on September 13, 1990, until it was transferred to petitioner on February 28, 1991, Stephen made timely monthly interest payments on the note. Jeffrey, however, did not report any interest income from Stephen on his 1990 and 1991 Federal income tax returns.

After the note was transferred to petitioner, Jeffrey continued to collect interest payments. Jeffrey testified that interest was paid on the note until approximately September 1992. At that time, Stephen informed Jeffrey that he was struggling and having trouble collecting his accounts receivable, and that he would no longer be able to make interest payments on the note.

On his 1992 Federal income tax return, petitioner reported interest from Stephen in the amount of $2,100, which is substantially less than the note provided. Petitioner allowed Jeffrey to keep any interest payments in excess of the $2,100. On two occasions Jeffrey, his wife, and their children visited petitioner in Florida. During these trips, Jeffrey and his family incurred expenses for airfare, hotel accommodations, renting a car, and other travel related expenses. Petitioner told Jeffrey to keep the interest payments as reimbursement for whatever travel expenses he incurred.

### 3. Fixed Schedule for Repayment

The note did not have a fixed schedule for repayment and had no fixed maturity date.

### 4. Security or Collateral

No security or collateral was requested.

### 5. Demand for Repayment

A formal demand for payment was made by Jeffrey, on behalf of petitioner, in a letter to Stephen dated August 7, 1993. Jeffrey also wrote letters to counsel for Super City Meats seeking payment on the note.

### 6. Records of the Loans

The parties' personal records reflect the transaction as a loan.

### 7. Actual Repayments

The record indicates that some interest payments were made.

### 8. Solvency of the borrower

Both Super City Meats and Stephen were solvent at the time of the loan.

We believe that when Jeffrey made the advance to Stephen, he had a real expectation that he would be repaid. He knew that Super City Meats was the beneficiary of life insurance on Stephen's co-owner, and he fully expected to be repaid from the insurance proceeds. By lending $100,000 to his brother, Jeffrey placed himself in a precarious personal and financial situation. First, Jeffrey testified that he did not have that type of money in his checking account and had to borrow against his securities

account at 10 to 12 percent interest. Second, Jeffrey also testified that his wife was furious when he told her about the loan. Third, at that time, Jeffrey had left his job at Citibank where he had been employed for 17 years. He had gone to work for a small consulting firm and stated that "the first day I joined them, I knew that it was a big mistake." Jeffrey's wife had also taken a leave of absence from her job due to pregnancy. Jeffrey's financial situation did not allow him to make the advance without the expectation of repayment. A bona fide loan existed between Jeffrey and Stephen.

When petitioner purchased the note, he stepped into Jeffrey's shoes as the creditor and was entitled to the same rights created under the note. See, e.g., First Union Natl. Bank of Florida v. Hall, 123 F.3d 1374 (11th Cir. 1997); Underhill v. Commissioner, 45 T.C. 489 (1966). A bona fide loan existed between petitioner and Stephen, and we believe that petitioner shared Jeffrey's expectation of repayment. Furthermore, we had an opportunity to observe petitioner's demeanor at trial and we find him to be credible. Accordingly, petitioners are entitled to the $100,000 nonbusiness bad debt deduction for 1993.

Issue 2. Charitable Contributions

Respondent determined that for 1993 petitioners were not entitled to certain deductions for charitable contributions.

We begin by noting that, as a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a);

Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are strictly a matter of legislative grace, and the taxpayer has the burden of establishing entitlement to any deduction claimed on the return.  Deputy v. duPont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

The taxpayer's burden of establishing his entitlement to a deduction includes the burden of substantiation.  Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).  The Court is not bound to accept unverified, undocumented testimony of the taxpayer.  Id. Accordingly, section 6001 and the regulations promulgated thereunder require the taxpayer to maintain records sufficient to enable the Commissioner to determine the taxpayer's correct tax liability.  Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965); sec. 1.6001-1(a), Income Tax Regs.

Petitioners claimed $7,603 of charitable contributions by cash or check on their 1993 Federal income tax return. Petitioners substantiated cash and check contributions in the amount of $4,051, and respondent disallowed the remaining $3,552. Petitioners have failed to meet their burden regarding the disallowed contributions by cash or check.  Accordingly, respondent's disallowance of the charitable contributions by cash or check in the amount of $3,552 is sustained.

Petitioners also claimed $20,138 of charitable contributions other than by cash or check on their 1993 Federal income tax

return. Respondent allowed $14,224 of the charitable contributions other than by cash or check. If a taxpayer claims a deduction for a charitable contribution of property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution reduced as provided in section 170 and the regulations promulgated thereunder. Sec. 1.170A-1(c)(1), Income Tax Regs. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.

In light of some confusion at trial and on brief, and to remedy certain computational errors in the stipulation of facts, we set forth the allowable contributions other than by cash or check below. Respondent allowed the following amounts for noncash charitable contributions:

|  | Claimed | Allowed |
|---|---|---|
| Morse Geriatric[1] | $1,342 | $413 |
| New Eyes for the Needy | 585 | 100 |
| Hadassah Bargain Spot | 1,426 | 507 |
| Animal Rescue League | 1,526 | -0- |
| Science Museum | 250 | -0- |
| Lions SightFirst | 90 | -0- |
| Municipal Library | 450 | 64 |
| Jewish Federation | 12,581 | 12,581 |
| JCC Thrift Store | 1,783 | 507 |
| Brandeis University | 105 | 52 |
|  | $20,138 | $14,224 |

[1]We note that the full name of this institution is the Nearly New Thrift Shop of the Morse Geriatric Center and is therefore represented twice in the stipulation of facts.

Petitioner testified regarding certain contributions that respondent disallowed entirely. Petitioner provided a receipt from the Animal Rescue League listing values, but he stated that he had no recollection of what the items were, other than a Chanel bag. We shall allow $99.50 for this single item as a donation to the Animal Rescue League. Petitioner also introduced a letter from The Science Museum thanking him for his contribution, which he testified was a stamp collection and a telescope. We shall allow $50 as a donation to The Science Museum. Finally, petitioner introduced what appears to be an advertisement for Lions SightFirst with "3 pairs prescription sunglasses" written above it. We shall allow $30 as a donation to Lions SightFirst.

Petitioners have failed to meet their burden of proving the fair market value of the other donated property is higher than that allowed by respondent. Accordingly, the amount of petitioners' charitable contributions other than by cash or check is $14,403.50.

For the foregoing reasons,

Decision will be entered under Rule 155.